(No. 17561.—Reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ERNEST KNIGHT, Plaintiff in Error.

*Opinion filed December 23, 1926.*

1. CRIMINAL LAW—*when indictment for receiving stolen property sufficiently describes property stolen.* An indictment which charges the defendant with receiving "twelve joints of meat" which had been stolen from a smokehouse sufficiently describes the property stolen, as a joint of meat is any large piece of meat as cut into portions by butchers, and the indictment is sufficient to inform the defendant of the charge against him.

2. SAME—*when evidence of other burglaries is not admissible in a prosecution for receiving stolen property.* In a prosecution for receiving "joints of meat" which had been stolen from a smokehouse, evidence of other burglaries in the same locality is not admissible where it throws no light on any feature of the crime charged, either of the burglary of the smokehouse, the receipt of the meat by the defendant with knowledge that it was stolen, or the identification of the meat, and such evidence is prejudicial if it tends to connect the defendant with the other burglaries.

3. SAME—*proof of knowledge that property was stolen is essential to conviction for receiving stolen property.* Knowledge of the defendant when he received the property that it was stolen is essential to a conviction of the crime of receiving stolen property knowing it to be stolen, and such knowledge must be proved beyond a reasonable doubt, and recent possession of stolen property is not evidence of such knowledge.

WRIT OF ERROR to the Circuit Court of Edgar county; the Hon. A. A. PARTLOW, Judge, presiding.

JAMES K. LAUHER, and WILBER H. HICKMAN, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, WALTER S. LAMON, State's Attorney, and JAMES B. SEARCY, for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

This writ of error was sued out to review the judgment of the circuit court of Edgar county convicting Ernest Knight of the crime of receiving stolen goods knowing them to be stolen.

The indictment was in one count, and charged the defendant with receiving twelve joints of meat, the property of Mike Remley, which had been stolen, well knowing that they had been stolen. A motion was made to quash the indictment for the reason that it does not state what a "joint of meat" is or the kind of meat. In the ordinary use of language "meat" refers to flesh of animals used for food, and a "joint of meat" is any large piece of meat as cut into portions by butchers. The indictment was sufficient to inform the defendant of the charge against him and to enable him to prepare for trial, and the motion to quash it was properly overruled.

It was proved that meat was stolen on Saturday, February 14, 1925, from the smokehouse of Mike Remley, the prosecuting witness, on his farm six miles east of Chrisman. On his return, about two o'clock in the afternoon, from Paris, where he had gone in the morning, he found the windows of the smokehouse broken out and twelve joints of sugar-cured meat, (the hams and shoulders of hogs,) which had been in the building, were gone. There were the tracks of two persons under the window, and in front

of the house were the tracks of an automobile. On February 17 Remley swore out a search warrant to search the premises of the defendant, who lived a mile and a half east of Brocton, in the northwest part of the county, and went with two deputy sheriffs and some other persons to the defendant's house. They found there in the defendant's smokehouse seven joints of sugar-cured meat piled on a barrel, which contained other meat cured with salt, and on the table in the kitchen of his house one shoulder which had been partly used. Remley testified that as they stepped inside the smokehouse where the meat was, he said in Knight's presence, "If that's my meat it's been re-wrapped." Later, when he was in the smokehouse, he took a joint off the barrel and unwrapped it, and found the cloth that was around the meat dry and the paper practically dry. He did not take the meat off the paper but folded the paper back. He examined to see whether there had been other paper on it, turned the joint over, and there were scraps of paper sticking to the meat. He then asked Knight whether this meat was in the original package as it was cured or whether it had been re-wrapped, and Knight answered, "In the original package." After finding the scraps of paper on the meat Remley said, "There is no use; this meat has been re-wrapped, because here is the old paper,— the scraps of that paper on it,—that shows that it has been re-wrapped," but Knight said in reply that it had not. Remley examined two or three more joints and found them like the first. The meat was then brought to Paris, and the sheriff, his deputy, the State's attorney and Remley laid the meat out and examined it. They found old-looking paper sticking to the meat. The largest scrap was a part of Meis Bros.' advertisement, with a picture on it. Remley testified that in wrapping the meat stolen from his house he used the *Danville Commercial News,* and he examined the files of that paper and found an advertisement in the issue of December 16, 1924, that corresponded with the

Meis Bros. advertisement which was on the scrap taken from the meat found at Knight's house. Remley testified as to the manner in which his meat was wrapped, that a square yard of cloth was laid down, a paper of the same size on top of that, the joint of meat then laid on the paper, the paper folded over the meat and the cloth folded over the meat both ways, the joint turned over and the cloth brought together, twisted, and tied in the middle of the joint. The stolen meat was hanging in the smokehouse by binder twine tied to each joint hung on a nail, and broken pieces of twine were found hanging to the cloth on some of the joints.

The only evidence connecting Knight with the stolen meat was the testimony of Remley tending to identify the meat as that taken from his smokehouse, the circumstances testified to in regard to the wrapping and re-wrapping of the meat, Knight's statements made at the time of Remley's visit to his house with the officers and the search warrant, and other statements made by him after his arrest. Since the judgment must be reversed for error occurring on the trial, we express no opinion as to the sufficiency of the identification of the meat.

In order to avoid a continuance on account of the absence of Myrtle Williams, the defendant admitted that she would testify, if present, to the facts set forth in the affidavit filed for the continuance, and the People offered in evidence the portion of the affidavit as to what she would testify. It was received over the objection of the defendant, and stated that "on the afternoon of the 14th of February, A. D. 1925, the residence of the said Myrtle Williams was burglarized and a large quantity of the goods and chattels of herself and her husband stolen therefrom; that as she and her husband were on the point of entering their automobile preparatory to leaving their home on the said 14th day of February, A. D. 1925, she, the said witness, noticed an automobile driving very slowly past her

said residence and noticed that one of the two occupants
of said automobile was carefully watching the movements
of herself and husband; that said car proceeded slowly
down the road and that she and her husband left their said
residence, departing in the direction taken by the said auto-
mobile; that after going a short distance the said automo-
bile turned into a bad and little used road a short distance
from her said residence; that she observed the condition
of the car and certain peculiar marks of mud upon the
said car; that later she was called to Paris and informed
that an abandoned car had been found in the neighborhood
of Brocton, Illinois, and that such car was parked on the
public square, and she was requested to walk around the
square and ascertain whether or not she could identify any
car upon the public square as the car which she had seen
passing her home on February 14, 1925, as above set forth;
that she started from the southeast corner of the public
square, made no stop at any car until she arrived at a point
on the west side of the public square near the pump, when
she pointed out a car to deputy sheriff Pennington, who was
following her, and stated that that car parked on the west
side of the square as aforesaid was the same car which she
had seen passing her residence as aforesaid on the 14th day
of February, A. D. 1925."

Ralph Humphrey, who lived about four and a half miles
west of Brocton, testified that a burglary was committed in
his house on the evening of February 14, 1925. He left
home at seven o'clock that evening and returned about nine.
He found the front door open, his guns gone and other
property taken. The burglars had reached the house by an
automobile, and the next morning he made a very close ex-
amination of the yard and found the imprint of automobile
tires in the soft ground. The tires on the left side of the
car had a peculiar tread-design. There was a bead in the
center of the tread that ran completely around, and run-

ning in either direction from the bead to the outside were rays, the impression of which on the ground ran backward, toward the rear of the car. The tire on the right front wheel was of the same brand but had been put on backward, and the rays of this tire ran forward. The tire on the right rear wheel was a Firestone cord with a hexagon button. He followed the car to Brocton and found tracks in the southeast part of the village leading in front of a house, corresponding to the tracks found in his yard. He ascertained who lived in the house and that they were related to the Knights. He then drove to the vicinity where the Knights lived and went to the residence of Ernest Knight and made an examination of the premises. There was no one at home. He found the tracks led in along the south side of his house to a shed with a dirt floor. The ground outside was rather soft. He saw tracks going in and out of the building corresponding with the tracks found in his yard, following the burglary. He made a copy of the tread-design as it was left in his yard and placed this copy on the treads he found on the premises of Knight and found that they corresponded identically,—all four wheels. In the shed, near the tracks left by the car, he found a testament with his name in it, which had been in his Sunday trousers, which were stolen at the time of the burglary. Humphrey then went to the State's attorney's office, swore out a search warrant for Knight's house, and returned within two hours with two deputy sheriffs and searched the premises. They saw joints and shoulders of meat there in the smokehouse and through the window in the kitchen a shoulder which had been cut into, but found none of the property which had been stolen from his house. He saw a car in Cook's garage at Brocton, and later in Paris, whose tires corresponded to the tracks which he found at his house after the burglary and afterwards at the house of the defendant. It was a Ford coupe. This car was shown by other testimony to have been found abandoned three miles

south of Brocton and on February 17 was taken to Paris and delivered to the sheriff at the jail and was the same car which was identified by Mrs. Williams, as shown in her testimony. There was no evidence connecting it with the car in which the meat was taken away from Remley's house. In regard to that car Remley testified that the tires were not alike; that the car had two kinds of tires on one side and the other had another kind. There was one track which was round; a little like a horse's foot; a little more like a mule's foot. It was rather long. This description of it does not correspond in any way with Humphrey's description of the automobile tracks at his house.

It was error to admit the evidence of Mrs. Williams and of Humphrey. Their testimony had no connection whatever with the burglary at Remley's house or the meat at Knight's. The burglaries at the respective houses of these two witnesses were entirely disconnected with the crime charged in this indictment,—the receipt of property stolen from Remley,—and threw no light on any feature of the crime charged, either the burglary at Remley's house, the receipt of the meat by Knight, his knowledge that it was stolen or the identification of the meat as Remley's, but the evidence was necessarily prejudicial to the defendant.

The court instructed the jury that it was the duty of the jury to consider the testimony of Myrtle Williams except in so far as it may state facts with reference to a burglary at her home. Since all the evidence of Myrtle Williams was incompetent it was error to instruct the jury to consider it.

The court refused the following instruction asked by the defendant:

"Possession of stolen property is not evidence of receiving or aiding in concealing stolen property. Unless the prosecution proves, beyond a reasonable doubt, that the meat in question was stolen, and that the defendant received the

meat in question, and at the time he received it he knew it was stolen meat, you cannot convict the defendant."

Knowledge of the defendant when he received it that the property was stolen is essential to a conviction of the crime of receiving stolen property knowing it to be stolen, and such knowledge must be proved beyond a reasonable doubt. (*Cohn* v. *People,* 197 Ill. 482; *People* v. *Lardner,* 296 id. 190; *People* v. *Ensor,* 310 id. 483.) The recent possession of stolen property is not evidence of such knowledge. (*People* v. *Lardner, supra.*) It was error to refuse the instruction.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*