(No. 22663. ▮)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ABE RUBIN, Plaintiff in Error.

*Opinion filed June 14, 1935—Rehearing denied October 22, 1935.*

312

Stone, C. J., and Jones and Wilson, JJ., dissenting.

Wm. Scott Stewart, for plaintiff in error.

Otto Kerner, Attorney General, Thomas J. Courtney, State's Attorney, A. B. Dennis, and J. J. Neiger, (Edward E. Wilson, Henry E. Seyfarth, and Martin Ward, of counsel,) for the People.

Mr. Justice Herrick delivered the opinion of the court:

The plaintiff in error, Abe Rubin, (hereinafter called the defendant,) was indicted in the criminal court of Cook county charged with receiving stolen property, consisting of 175 ladies' coats, 20 ladies' suits and three ladies' dresses, of the value of $1848.50. The cause was tried before the court without a jury. The defendant was found guilty and sentenced to the penitentiary. From the judgment of conviction the defendant has sued out this writ of error.

On the trial of the cause it was stipulated that the merchandise involved was the property of the complaining witness, Julius Siegel, and was the proceeds of a burglary of

his store in Chicago in September, 1933, and that the goods were found on the first floor and in the basement of the defendant's premises, at 1324 Milwaukee avenue, on January 13, 1934. The error assigned and argued is whether the evidence established, beyond a reasonable doubt, that the defendant received the goods knowing them to have been stolen.

Siegel testified that on January 12, 1934, while traveling on a street car, he noticed a young lady wearing a coat which looked familiar to him; that he had a conversation with her, examined the coat, identified it as one of the stolen coats, and learned from her that she had bought the coat at the defendant's place of business. That afternoon Emma Salitan, who is a niece of the prosecuting witness, and her father, went to the defendant's store, where on a rack she saw a coat which she thought belonged to her uncle, tried on the coat and told the saleslady that she would be back later with her uncle to look at it. The coat was priced to her by the saleslady at $16.95. Later in the day Miss Salitan and Siegel returned to the store. Siegel did not say whether the defendant waited on him but stated that a "clerk, manager, or whatever it is," waited on him. Siegel examined the coat and identified it as his own, and after negotiations about the price succeeded in buying it for his niece for $10. Siegel paid five dollars as a deposit, got a receipt therefor, his niece wrote her name in the lining of the coat, and the coat was left pending the payment of the balance of the purchase price. The next morning Siegel, his brother-in-law, Salitan, and Miss Salitan, went to the office of Ralph Rubin, who was Siegel's attorney and his nephew by marriage. All these parties then went from the law office to one of the judges of the municipal court and there procured a search warrant for the defendant's place of business. Siegel, Salitan, attorney Rubin, Miss Salitan and officers Barry and Curtin went together to the defendant's place of business. Siegel and

his niece first entered the store. There Miss Salitan engaged the defendant in conversation until the remainder of the party had entered the store. Officer Curtin served the warrant upon the defendant, telling him it was claimed that the goods stolen from Siegel's store were on the defendant's premises. According to the testimony of Curtin and Siegel the defendant told them that he did not know what it was all about; that they were welcome to make a search—to look around; that if they picked out anything they should not cause any confusion but as merchandise was selected to put it to one side. There was a clothes rack immediately in front of the entrance to the store. Racks were also on the sides of the room. Some of the goods recovered were on the rack, in plain view, in front of the door, while others were openly displayed on racks on the two sides of the room. There is no evidence as to what merchandise, if any, was displayed in the window of the store. All witnesses agreed that the searching party was in nowise obstructed nor hindered in making a thorough and complete search of the store room.

When the search of the first floor was completed, officer Curtin told the defendant that the searchers would like to go to the basement. The defendant said to go ahead, and turned on the light in the basement. Siegel, Ralph Rubin, Miss Salitan, Curtin and the defendant went to the basement together. The searching party explored the basement and found a vault there. As to just what happened when this vault was located is a highly controversial issue in the case. Curtin testified, in substance, that the defendant was asked to open the vault; that the defendant replied that he did not think he could get it open, but he did manage to open it. Ralph Rubin testified that he asked the defendant to go down to the basement; that the defendant stated he was busy but that when he got through he would take them down, to which attorney Rubin replied that unless the defendant took them to the basement

they would go down by force. The defendant then replied
that he would take them down, and that while going to
the basement the defendant said, "There is nothing down
here; you can see for yourselves there is nothing down
here." Arriving at the vault the defendant was asked to
open it, and he said he did not know the combination. At-
torney Rubin asked the officers, in substance, if they could
not blow the vault open, and the defendant said he would
open the vault, and that, as a matter of fact, the vault door
was not locked. Miss Salitan and Siegel testified to sub-
stantially the same matter. They were not corroborated,
however, by Curtin.

There was also a controversy as to what happened
when the vault was opened. Ralph Rubin testified the de-
fendant said there was no light in there. This is contra-
dicted by the defendant. Ralph Rubin testified that when
the searchers said they would light matches or get flash-
lights the defendant went into the vault and turned on the
electric light. Ralph Rubin stated that officer Curtin di-
rected them not to light a match in the vault. It was con-
ceded by all parties that the light was a socket light with
no switch, was in the center of the vault, and that the only
way to turn on the electricity was at the light. Curtin,
although called by the People, was not questioned about
nor did he testify upon the subject of the light in the vault
or any conversation relative to lighting matches, procur-
ing flashlights, any inquiry or threat to blow open or use
force in opening the vault, or any delay on the part of the
defendant in turning on the light in the vault, although the
police officer did testify that he and the defendant entered
the vault. In the vault the searchers found more of Siegel's
winter coats on racks, spring stock in boxes, suits, three
dresses and an uncompleted suit, and a coat that was be-
ing made up for Miss Salitan. The boxes were New York
boxes—none of them were Siegel's. Siegel, Miss Salitan
and Ralph Rubin stated that at the point of opening the

boxes the defendant made a statement that the searchers had enough evidence to put him in jail. Miss Salitan testified that the defendant made a similar remark when asked to open the vault. There was also testimony that he made a like statement before the party came to the basement. These alleged statements were denied by the defendant. Ralph Rubin and Miss Salitan were not corroborated as to these statements, and Curtin testified that while he was in the basement he heard no conversation out of the ordinary, and that the parties were all talking about the goods and the clothing.

The original price tags were on much of the goods in the vault. Siegel and Ralph Rubin both testified that the defendant pulled off some of the tags. Ralph Rubin went into detail about this alleged circumstance. He said he saw the defendant pulling the tags off the coats. The witness then proceeded to relate his alleged statements to the defendant and what then occurred, as follows:

"If you are innocent of all this you don't have to pull tags off the coat. Well, immediately he ran out of the vault. I said, 'Give me those tags that you pulled off.' He ran out of the vault and I ran after him. I said, 'Take the tags out of your pocket and give them to me.' And I hollered pretty loud. They heard me up-stairs. 'Give me those tags.' He then took the tags out of his pocket and threw them on the floor, and I had hollered so loud a girl had come down-stairs that worked for him and she said, 'What's the matter? What's the matter?' I said, 'Nothing's the matter.' And I started to pick up all those tags as he threw them down. Then the detectives came down and I told them about it and I held the tags. When we got to the detective bureau, I turned them over to the detectives."

This testimony is denied by the defendant. Officer Curtin, although testifying as a witness for the People, did not testify upon this subject. Officer Barry was not produced, nor did the People produce the girl clerk who it is said made the inquiry mentioned above. Miss Salitan

testified that she was not present at the time of the tag episode. She does not explain her absence, although it is apparent from the testimony that she was very active in making the search.

The merchandise in the vault, with the exception of a few garments, was unfinished material and spring goods. The merchandise found up-stairs, according to Miss Salitan, was fall goods and according to Siegel was winter goods. Siegel prior to September, 1933, did business in Brooklyn, N. Y. All the goods in question were merchandise which Siegel had in his Brooklyn store before coming to Chicago. He had the goods from the previous season in Brooklyn and had not purchased any new merchandise. Siegel testified that the coat which Miss Salitan bought cost $12 to produce, wholesaled at $16.75 and retailed at $22.50. Miss Salitan, who had only two weeks' experience in the ladies' garment trade, testified that the fair market value of the coat was $16.95, but she did not know its manufacturing cost.

Samuel Albin, an apparently disinterested witness, a resident of Chicago, who had been doing manufacturing and resident buying in New York for the past twenty years and who had been since about 1905 in the business of manufacturing ladies' coats and dealt as a representative in the selling and purchasing of ladies' coats, testified that the coat in question was of Girard cloth, of a style of two years before and was an early-fall coat for October and September; that a coat of that type was usually cut in sizes from 18 to 20, with an average of from $2\frac{5}{8}$ to $2\frac{3}{4}$ yards of cloth, the cost of the material being about $2.48 a yard, and that the lining was from thirty-five to forty cents a yard, pre-NRA. He further testified there was no such thing as a reasonable market value for such a coat to a dealer in October, 1933; that such coats were bought at from three dollars to six dollars, and that a price of from $4.50 to $5 per garment was a reasonable price to

be paid by the dealer at that time. The testimony of the defendant was that the goods were out of date and of the style of two years before, as stated by Albin.

The People call attention to the fact that on cross-examination of Siegel he stated, in response to a question asked him as to who showed him the coat which he bought for his niece, that the manager showed him a coat. The witness then interjected, "He wanted to give me a bargain; if I wanted to buy the other coat he would give it to me for $8 which it cost $50 originally." This answer was not responsive to the question asked, and the defendant's attorney, although not using the word "disclaim," apparently attempted to disclaim the answer, and it was seemingly so understood by the People, as the People did not endeavor to follow up the matter, did not produce the coat in question nor offer any evidence as to the value of the coat about which Siegel claimed he had the conversation.

The defendant testified that he had been in the ladies' clothing and garment business, conducting a retail store either for his father or on his own account since 1920, and that the business was known as "Rubins" and was incorporated. The defendant stated that he purchased the goods in question from a man by the name of B. Morris on October 18, 1933. He had known Morris for five or six years; had first become acquainted with him in New York; had seen him in that city on various occasions during the six-year period; knew during that time that Morris was connected with two different firms which were in the business of manufacturing ladies' coats and suits and Morris was a salesman for them. The defendant related that on October 17, 1933, while making the rounds of the West Side manufacturers in Chicago, he met Morris at the place of business of the Bijou Dress Company. The next morning Morris telephoned and asked him to come to the Fort Dearborn Hotel. The defendant went there, accompanied by Oscar Lipman, a friend engaged in the men's clothing

and furnishing business; the defendant and Lipman went to Morris' room on the fourth or fifth floor; the number of the room defendant did not remember; there Morris showed him a number of ladies' coats which he had on display. Morris stated he had over two hundred of those garments, had given up his store in the east, and as he expected to reside in Chicago and continue business there he had found it necessary to ship the goods to Chicago in order to close them out. Morris told the defendant that the remainder of the goods were at the express office. The defendant told Morris that he could not tell whether he would purchase the goods; that he would first have to examine the remainder of the merchandise, and that Morris could bring the goods to the defendant's store that afternoon. The goods were delivered about 4:30 of the same afternoon at the front of the store on a regular business day and while the store was open for business. Besides the defendant and the expressman there were present when the goods were delivered, the defendant's employee Komiss, Morris, and a number of customers of the store. Morris came in, stating he had the merchandise about which he had talked that morning. The defendant told him to bring it in. The truck driver, Komiss, Morris and the defendant carried in the goods, which were packed in regular express boxes. The boxes were all opened. All the clothing was hung up on a rack which reached the entire length of one side of the store. The defendant there inspected it, told Morris that he could not use the goods because of the fact that contained in the lot were spring merchandise and obsolete merchandise. Morris urged the purchase, and it was finally agreed the defendant would retain the goods on consignment, paying Morris five dollars for each garment sold; that the spring goods would have to be packed away, as the defendant's establishment was a style store. On the consignment agreement 253 garments were accepted. He then asked Morris to assist him in placing the goods in

the vault, which Morris did. The next day some of the merchandise was brought up, each class being placed on its proper rack. The defendant gave Morris a receipt for the goods on consignment written on an NRA card, with no price stated. The defendant stated that he gave no receipt to the expressman, as the delivery was not made for the defendant but for Morris. There is no evidence that the expressman asked for a receipt. The defendant said the truck was a regular express truck, as the Railway Express Company did not deliver goods left for storage. From the goods brought up to the store salesroom the next day the defendant removed the tags, replacing them with his own, but the goods remaining in the vault had the original tags thereon and so remained until the search in question was made. The defendant also put a trade label on the goods which he placed in stock but not on any goods stored away. At the time he received the goods on consignment he believed that the reasonable value thereof was five dollars per garment. Morris returned on Saturday, November 25, and asked for cash to meet his pay-roll. He stated he was at that time manufacturing goods in Chicago as a jobber and having a contractor make up merchandise for him. The defendant paid him $250 in cash that day. The defendant knew that Morris had engaged Ballis, who operated the Bijou Dress Company, to manufacture merchandise for him, and that it was customary in the garment trade for the jobber to meet the pay-roll of his contractor. At this time the defendant had sold about forty garments. Subsequently, on December 9, Morris again returned and asked for more money. The defendant objected to making payment and informed Morris the goods were moving slowly and offered to return the goods. However, he eventually paid him $200 for the purpose of enabling Morris to meet his pay-roll. At this time about sixty garments had been sold. The merchandise was entered on the defendant's stock book, which was the book

in which merchandise was entered, together with the name of the house from which the merchandise came. The name of the company on the bill which the defendant received from Morris was "R. A. Y. Garment Company."

The defendant testified that on the occasion when the warrant was served on him he stated that the claim that he had stolen merchandise in his possession sounded ridiculous, but if the parties had a warrant they were welcome to search the store and he would be glad to help in any way he could. He called the attention of the parties to the fact that the store was busy and requested that they use discretion and not make any tumult in making the search. He assisted Siegel in searching for the goods, and as Siegel picked out the garments he claimed, they were put to one side. From time to time the defendant was called to attend to the wants of different customers but when able he offered the party what assistance he could. Everyone acted quietly except Siegel and attorney Rubin. Attorney Rubin appeared highly nervous and kept running about the premises. When Rubin asked about the basement the defendant requested the party to wait a few minutes, as he was busy, and he would take them down. He denied making the statement, in effect, "You have enough evidence on me to hang me or send me to jail for life."

With reference to the incident at the vault the defendant testified that upon returning from the rear of the basement, to which the party had gone, they came to the merchandise vault. Rubin, the attorney, demanded to know what was in there. The defendant asked him to be a little bit respectful and courteous, and to remember that he, the defendant, was still the owner of the premises. Rubin, the attorney, then commanded that the door be opened. The defendant told him he did not think he had to open it. Rubin got officer Curtin, and the defendant inquired of the officer if he had to open the vault. The officer advised him he did, and the defendant stated to him, "It is

an old door; sometimes we have trouble with it." He took hold of the door and opened it, and as he swung the door open, the party, excepting the officer, ran in. They could see nothing and were going to light a match, and the defendant went in and turned the light on. The defendant requested any goods not Siegel's should be placed on one rack and all that was Siegel's should be placed on another. Siegel inquired as to the contents of the boxes in the vault. The defendant informed him they contained spring merchandise packed away to keep clean. Siegel stated some of his goods had been spring merchandise, and the defendant then took down the first box and went through it. All the boxes were examined. Siegel removed what goods belonged to him and the defendant re-packed the boxes as the examination was finished. After the searching party had gone through the boxes someone made a request to go through them again, and this was done. The defendant also testified that on the occasion when he paid Morris he got a receipt and also a bill of the goods; that he delivered all these papers to his attorney, and the stock book was at his office. None of these writings, including the stock book, were offered in evidence. There was some obsolete merchandise hanging in the vault that the defendant did not pay anything for—that was only fit for repair work, out of style or damaged. The defendant specifically denied removing any tags in the vault from the goods there or that he dropped any tags in the vault or on the basement floor. The defendant said that when Siegel started claiming the goods up-stairs, attorney Rubin said to the defendant, "It looks pretty bad for you." The defendant replied he did not know what he meant by that and asked him who he was, to which Rubin replied he was Siegel's lawyer. The defendant further narrated that at the police station he was taken into a room in which attorney Rubin was present. The officers began to ask him questions and Rubin also began to interrogate him. The defendant refused to

answer anything in the presence of the attorney, stating that he did not think it was right to have the attorney for the man who claimed his merchandise was stolen and in the defendant's store questioning him. The officers sent attorney Rubin out of the room. The defendant then related to the officers that so far as he could see by the tags the merchandise came from Morris, and that the last he knew of Morris he was stopping at the Fort Dearborn Hotel. He answered all questions put to him. His testimony with reference to this examination was not contradicted.

The defendant specifically testified that at the time he acquired the garments he did not know they had been stolen, and nothing was stated to him at the time that would cause him to believe they might have been stolen; that at the time the goods were left with him on consignment he believed that Morris had given up his store in the east, since he was contracting in Chicago, and for that reason Morris wanted to dispose of those goods. He testified the reasonable value of the garments consigned to him in October was five dollars per garment. He gave a description of Morris which coincides with the description given by other witnesses testifying in the case. After the defendant's arrest he began a search for Morris, going to New York to various wholesale houses in and about the cloak industries and in and about sundry restaurants. He also had his attorney make inquiries at the Fort Dearborn Hotel in an effort to locate Morris and investigate his transactions at that hotel. The attorney for the defendant, in addition to searching for Morris and attempting to get some clue of his whereabouts at the Fort Dearborn Hotel, searched for him at Ballis' and Ferdinand's places. Ferdinand is a contractor who manufactures dresses and jobs dresses and goods in Chicago.

Seven reputable and apparently disinterested and qualified witnesses testified to the good reputation of the defendant for honesty and integrity. Amongst those were

witnesses who had served on a committee of the Chamber of Commerce with the defendant and on a committee organized in December, 1933, for the purpose of opening up a new bank on Milwaukee avenue. One of the reputation witnesses was a reporter for Dun & Bradstreet. He had known the defendant for approximately eighteen years. In connection with the witness' work he had had occasion to investigate the defendant's reputation and character. The defendant testified that he had never previously been arrested or charged with any criminal offense.

Herman Ballis, a manufacturer of ladies' dresses, who had known the defendant for fifteen or twenty years, stated that he knew Morris, met him in October, 1933, and entered into a business arrangement with Morris whereby Ballis manufactured dresses for him. During the time he was manufacturing dresses for Morris the defendant came to Ballis' place of business, which was customary, as the witness and the defendant did business together. On one of these occasions Morris was at the place of business of the witness when the defendant was there. Morris and the defendant had a conversation in which the witness did not join. Morris had told the witness, in substance, if at any time he wanted him he could get in touch with him by calling him at the Fort Dearborn Hotel; that Morris had a place on Milwaukee avenue and gave his address as 1479 Milwaukee avenue, although this witness never visited him at either the hotel or his place of business. He identified a ledger sheet showing business transactions with Morris during October and up to the second day of November, 1933. He pointed out on the cash column the different payments made by Morris and testified they were all made in cash. His book-keeper also identified the ledger sheet and stated that the entries were made thereon by her and were true and correct.

David J. Komiss corroborated the defendant as to the delivery of the goods at his store on October 18, 1933;

that there were other people in the store, and that he was introduced to Morris by the defendant on that occasion. Morris had driven up to the store either preceding or following the truck which brought the merchandise, and on entering the store Morris told the defendant he had the merchandise. It was brought into the front part of the store, unpacked and hung up. There was a conversation there between Morris and the defendant as to the value of the goods.

Oscar Lipman, who was in the men's clothing and furnishing business, testified he had known the defendant for thirty years; that about the 15th of October he had occasion to visit the premises of the defendant on Milwaukee avenue, and on that occasion went with the defendant to one of the upper floors in the Fort Dearborn Hotel and was there introduced to a man by the name of Morris. There were ladies' coats on a chair, some hanging on a rack, and Morris brought others out of a clothes closet. The defendant asked Morris why he had called him down, and Morris stated he had coats and ladies' garments which he had shipped from New York, and that he wanted to dispose of these because he was liquidating his business in New York. The defendant looked at the garments and told Morris to come to his place of business in the afternoon and he would look them over and then advise him whether he would buy.

Max Chavin, who was in the ladies' garment business on Maxwell street, testified that he knew B. Morris; that he purchased merchandise from Morris in October, 1933; that Morris and his salesman came to his store with samples and he purchased two dresses and paid for them. Irving Funt, a manufacturer and retailer of dresses, and who had a place of business on South Market and another on South Ashland, testified that he knew B. Morris and had bought merchandise from him.

Samuel Albin, hereinabove referred to, further testified that he knew Morris and had known him since 1925, when Albin sold Morris a factory in New York City. He stated that he had seen him in the New York market probably fifty times during the time he had known him; that Morris had been connected with two different businesses in New York and with a general retail store in Chicago, and the last time witness had seen Morris was when he was having dresses made up by H. Ballis. Morris had told him that Ballis was making the dresses.

Sam Shapiro testified that he was in the business of sub-contracting the manufacture of ladies' wearing apparel and his business was known as Ferdinand & Shapiro. He knew Morris and had done work for him in September, 1933, and in the fall of 1933 made dresses for him for six weeks. It was stipulated that if Ferdinand were present he would testify Morris in the fall of 1933 delivered cut-up goods to be sewed together in large quantities; that Morris entered into a contract with him to manufacture the garments; that Morris remained in the factory days at a time directing how the goods were to be assembled and personally supervised the details; that Morris had salesmen who worked for him; that Morris paid him cash for the work as it was done; that after Ferdinand had some dispute with Morris he ceased to have his manufacturing done there and made arrangements with Ballis for the manufacturing. It was stipulated that if a salesman were present he would testify he worked for Morris some time on or about September 30, 1933.

William C. Lackey, chief clerk at the Fort Dearborn Hotel, testified for the People, in rebuttal, that Morris was not registered at the hotel between October 10 and 21; that if a guest had registered there October 1 and remained for the balance of the month an examination of the registration cards commencing with October 10 would not disclose that fact; also that parties registered at the hotel

under assumed names on different occasions; that he examined the ledger for the month of October, 1933, and found no account with a man by the name of B. Morris.

Ralph Rubin testified the defendant said everything was bought in New York and he had bills for it, while Siegel stated the defendant "showed bills that he was buying merchandise from New York."

In considering the evidence in the case we are impressed with the apparent interest which the witnesses Siegel, Miss Salitan and Ralph Rubin manifested in the trial. There are several material facts testified to by them in which they are contradicted, and in others they are not corroborated by police sergeant Curtin. It is also to be noted that officer Barry, who was present when the search was made of the defendant's premises, did not testify for the People.

It is conclusively established that B. Morris had been a dealer and jobber in ladies' coats and garments in New York City and was a jobber in the same line of industry in Chicago at the time the defendant acquired from him the merchandise in question. B. Morris was well known to the coat and garment trade in Chicago and New York. The circumstance that Morris was not produced by the defendant does not militate against the defendant's case. If the defendant had made no statement to the effect that he bought the merchandise of Morris, there was a dearth of evidence in the record even tending to show that the goods had ever been sold or consigned to or received by the defendant from any third party. Without proof of this character no conviction could have been had for the offense of receiving stolen property. Without the testimony of the defendant, if the evidence tended to establish a criminal offense committed by the defendant it would be that of larceny.

In order to sustain a conviction for receiving stolen property four constituent elements must be proved: (1) That the property has in fact been stolen by a person other

than the one charged with receiving it; (2) that the one charged with receiving it has actually received the property stolen or aided in concealing it; (3) that the receiver knew the property was stolen at the time he received it; and (4) that he received the property for his own gain or to prevent the owner from gaining possession of it. (*People* v. *Prall,* 314 Ill. 518; *People* v. *Ensor,* 310 id. 483.) The element of guilty knowledge on the part of the receiver must be proved, beyond a reasonable doubt, to have been present at the time of the receipt of the goods by him. (*People* v. *Knight,* 323 Ill. 567; *People* v. *Miller,* 292 id. 318; *People* v. *Schallman,* 273 id. 564; *May* v. *People,* 60 id. 119.) The mere recent possession of stolen property is not evidence of guilty knowledge. (*People* v. *Brooks,* 340 Ill. 74; *People* v. *Knight, supra.*) Where circumstantial evidence, alone, is relied on, the circumstances, when considered together, must point to the fact clearly and conclusively, beyond a reasonable doubt, that the defendant knew the goods were stolen at the time he received them and must exclude every reasonable hypothesis other than that of guilt. (*Cohn* v. *People,* 197 Ill. 482; *May* v. *People, supra.*) The open display by the defendant of the stolen goods negatives guilty knowledge. *Barron* v. *People,* 73 Ill. 256; *Conkwright* v. *People,* 35 id. 204.

This court has said that where the goods were purchased at far less than their value such fact was a circumstance tending to show the guilt of the defendant. (*People* v. *Boneau,* 327 Ill. 194; *Weinberg* v. *People,* 208 id. 15; *Huggins* v. *People,* 135 id. 243.) The converse of the rule follows, that where the evidence discloses the property was purchased at a fair price such circumstance tends to refute guilty knowledge. *Andrews* v. *People,* 60 Ill. 354; *People* v. *Cochrane,* 1 Wheeler's Crim. Cas. (N. Y.) 81; *People* v. *Teal,* id. 199; *Davis* v. *State,* 193 Pac. (Okla.) 745.

The witnesses agree that the goods were not in the most recent style. As to how long they were outmoded is a controverted question, the only evidence for the People on the subject being that of the prosecuting witness and his niece of two weeks' experience in the garment trade, and for the defense the witness Albin, an apparently qualified, disinterested witness, and the defendant. It is a matter of common knowledge that in the merchandising of ladies' garments, seasonable goods, when out of season or of a previous year's style, rapidly depreciate in market value. The purchase of goods from a regular dealer known to the trade and in the ordinary business course is a circumstance which tends to negative guilty knowledge. *Friedberg* v. *People,* 102 Ill. 160, 162.

The fact that the goods were openly delivered to the defendant's place of business in the daytime, during business hours and in the presence of customers and employees and in sight of the public generally there on the streets, negatives guilty knowledge. (*Jupitz* v. *People,* 34 Ill. 516, 521; *Friedberg* v. *People, supra,* 162, 163.) The fact that the defendant permitted the original price tags to remain on the goods may properly be a circumstance tending to negative guilty knowledge, rather than, as contended by the People, a fact tending to establish guilty knowledge. (1 Moore's Ill. Crim. Proc. sec. 683, p. 481; *People* v. *Cochrane, supra; People* v. *Teal, supra.*) The defendant's willingness to permit his premises to be searched and his assistance therein are circumstances tending to show lack of guilty knowledge. (Moore's Ill. Crim. Proc. sec. 683; *Conkwright* v. *People, supra.*) So, also, a reasonable explanation of the possession of stolen property may indicate a lack of guilty knowledge, (*Conkwright* v. *People, supra,*) and the good reputation of the defendant, when considered with other factors shown to exist in favor of his innocence, may be sufficient to create a reasonable

doubt of the defendant's guilt. *People* v. *Koloski,* 309 Ill. 468; *People* v. *Brooks, supra; Jupitz* v. *People, supra.*

This court is reluctant to reverse a judgment of conviction in a criminal case on the sole ground that a defendant's guilt has not been proved to the degree required by law, but where such condition exists in the record we would be remiss in our duty if we held otherwise. (*People* v. *Lucania,* 360 Ill. 150; *People* v. *Freeland,* 284 id. 190.) While in the case at bar there are some circumstances and facts tending to create the suspicion that the defendant is guilty, yet there are many facts and circumstances which, when considered with the good reputation of the defendant so clearly proved, tend to establish his innocence. The case against the defendant is so inconclusive that it becomes our duty to reverse the judgment of conviction.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

STONE, C. J., and JONES and WILSON, JJ., dissenting.