THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* TOM DICKERSON, Defendant-Appellant.

Second District   No. 72-214

Opinion filed August 17, 1976.

Welsh, Holmstrom, Hyzer, Jacobson & Worden, of Rockford, for appellant.

Philip G. Reinhard, State's Attorney, of Rockford (Edward N. Morris, of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE THOMAS J. MORAN delivered the opinion of the court: Defendant was charged with the theft of five snowmobiles under section 16—1(d)(1) of the Criminal Code of 1961 (Ill. Rev. Stat. 1971, ch. 38, par. 16—1(d)(1)), and thereunder was found guilty by a jury.

This case returns to us from the supreme court which, in 61 Ill. 2d 580 (1975), reversed the holding of this court which had found the indictment fatally defective. *(People v. Dickerson,* 21 Ill. App. 3d 977 (1974).) On remand, the supreme court directs us to consider the issues not addressed in our earlier opinion: that the statute under which defendant was charged was incorrectly interpreted and applied in this case, that the evidence did not prove defendant guilty beyond a reasonable doubt, and that the statute is unconstitutional for vagueness. From our review, we find it unnecessary to reach the last contention.

■■ Defendant urges that during the jury trial the State erroneously and recurrently referred to the crime charged as a possessory or continuing offense; that the court submitted jury instructions which indicated mere possession of stolen goods constituted the offense, regardless of the time defendant gained knowledge that the goods were stolen; and that such erroneous characterization of the crime charged and such erroneous instructions constitute reversible error. We agree. The

pertinent part of section 16—1(d), under which defendant was charged, provides that a person commits theft when he knowingly:

"(d) Obtains control over stolen property * * * under such circumstances as would reasonably induce him to believe that the property was stolen, and

(1) Intends to deprive the owner permanently of the use or benefit of the property * * *."

■■ The crime with which defendant was charged is the statutory equivalent of the much older crime of receiving stolen property. (See *People v. Baxa*, 50 Ill. 2d 111, 115 (1971); *People v. Rubin*, 361 Ill. 311, 327-28 (1935).) *Knowledge* by defendant that the property was stolen *when he received it* has been, and still is, an element of this offense. *(Baxa*, at 114, 115; *People v. Stewart*, 20 Ill. 2d 387, 392 (1960); *Rubin*, at 328; *People v. Weiss*, 34 Ill. App. 3d 840, 842 (1976).) The modern statute provides an alternative element to proof of actual knowledge—proof that stolen property was obtained under such circumstances as would reasonably induce the defendant to believe the property stolen. The addition of this statutory alternative does nothing to alter the crucial time frame requisite to the "guilty knowledge" element. The actual knowledge, or the circumstances which would reasonably induce such belief, must exist at the time of receipt of the stolen property; knowledge gained afterward does not satisfy this critical element.

■■ This is not to say that the modern theft statute does not include a section broad enough to include the continuing offense of possession of stolen goods which are discovered to be stolen goods only after their receipt. Section 16—1(a) apparently encompasses such an offense. *(People v. Marino*, 44 Ill. 2d 562, 576 (1970).) It is elementary, however, that a defendant may be convicted of only the offense with which he is charged, not of another offense with which he might have been charged. Defendant was not charged with a violation of section 16—1(a).

■■ With the above understanding of the crime charged, we consider defendant's contentions that error was committed in the submission of People's Instructions 11 and 12 to the jury. These instructions were:

"(11) Possession is a voluntary act if the offender knowingly procured or received the thing possessed, *or was aware of his control thereof for a sufficient time to have been able to terminate his possession.*" (Emphasis added.)

"(12) A material element of every crime is a voluntary act, *which includes an omission to perform a duty which the law imposes on the offender and which he is physically capable of performing.*" (Emphasis added.)

These instructions, as well as the opening and closing statements of the

State, implied authority to convict defendant of the crime charged merely because of his failure to terminate possession of the stolen snowmobiles when he found them to be stolen, at a time when he was physically capable of returning them. In light of the discussion above, such instructions and argument are incorrect to the extent they indicate that the offense charged is a continuing offense. The error was prejudicial in view of defendant's virtual admission at trial that, about a week after receiving them, he suspected the subject snowmobiles were stolen but took no immediate steps to turn them over to the police. (See further discussion of the facts of this case, *infra.*)

We next consider whether the evidence presented at trial was sufficient to prove defendant guilty, beyond a reasonable doubt, of a violation of section 16—1(d). We note that when this case was first before us, Justice Guild specially concurred on the basis that the evidence of guilty knowledge was insufficient.

■■ Defendant does not contest the fact that the snowmobiles were stolen. The critical question is whether guilty knowledge on the part of defendant is indicated by the circumstances under which he obtained the stolen property. There is a long line of cases involving receiving stolen property which line indicates that when circumstantial evidence alone is relied on to prove the element of guilty knowledge, the circumstances must point clearly and conclusively, beyond a reasonable doubt, to the fact that "defendant knew the goods were stolen at the time he received them *and must exclude every reasonable hypothesis other than that of guilt."* (Emphasis added.) *(People v. Rubin,* 361 Ill. 311, 328 (1935); *People v. Berg,* 91 Ill. App. 2d 166, 170 (1968); see *People v. Legear,* 29 Ill. App. 3d 884, 888 (1975).) Having reviewed the record in light of the applicable standards, we find insufficient evidence of guilty knowledge at the time defendant received the stolen goods to sustain his conviction under section 16—1(d).

These facts are uncontroverted. In the fall of 1971, a truckload of 42 Arctic Cat 440 Panther snowmobiles was stolen in Minnesota. Fifteen of the snowmobiles found their way to Jim Cordray, a former deputy sheriff with the Boone County Sheriff's Department. Cordray offered to sell some of these to Jay Hurn, a long-time friend of defendant and owner of a local sanitary service in Rockford. On the night of October 6, 1971, Hurn called defendant, head of a large local real estate office, and told him that snowmobiles such as those described above were available for purchase without warranties for $550 each. Hurn also called LeRoy Palmer (another long-time friend, and a distant relative) with the same offer. On the morning of October 7, Hurn purchased two of the machines himself, Palmer one. Later that morning, defendant inspected Hurn's

freshly acquired snowmobiles and, finding them to be new Panther 440's, agreed to purchase five like machines through Hurn. Cordray, Hurn, and others delivered the machines that day. The following day, defendant went to Hurn's house to pay for the machines, found Hurn was not at home, and left $2750 in cash with Hurn's wife in payment for the machines. He received no bill of sale or receipt. The five snowmobiles, with serial numbers intact, were stored in defendant's garage. On Sunday, October 10, one of defendant's salesmen[1] came to pick defendant up for a business appointment. He observed that defendant's garage door was open and one "couldn't help but notice" the snowmobiles which were clearly visible, and were covered only by a sheet of clear plastic.

Near noon on October 13, defendant and Hurn left for a hunting trip in Puckaway, Wisconsin. That evening, Mrs. Hurn called her husband in Puckaway to tell him of an article in a local newspaper which reported stolen snowmobiles in the Rockford area. On October 14, police arrived at defendant's home, and defendant's wife agreed to open the garage for them to inspect the snowmobiles. Finding them to be part of the stolen shipment, the police removed the machines from defendant's garage. Defendant's wife thereupon called her husband in Puckaway informing him that the police had come regarding the snowmobiles and, shortly after the phone call, defendant and Hurn returned to Rockford. The next morning, October 15, defendant appeared at the police station where he made the first of two statements. Therein he falsely stated that he had dealt by phone with an unknown person who indicated the snowmobiles were part of an insurance settlement, and also falsely stated that his wife had paid the unknown men who delivered them. On Monday, October 18, defendant, hearing that there was an arrest warrant for him, went to the police station, learned that Hurn had by then made a statement, said he no longer had anyone to protect, and made a second statement naming Hurn as the party through whom the snowmobiles were purchased. In this statement he again claimed he was told these were new snowmobiles available for $550 each, purchased as part of an insurance deal through a deputy sheriff in Belvidere.

The State argues that the following circumstances would reasonably induce defendant to believe that the property was stolen. Defendant, by his own admission, was knowledgeable about snowmobiles, owning two at the time of this transaction; the snowmobiles offered for sale for $550 were new Arctic Cat Panther 440's and defendant admits he thought the machines were each worth $1050; the suggested list price for that model was $1300, the distributor's price 40% less, and there was evidence which tended to indicate that these machines were carried under a "sell-back

---

[1]This witness was no longer employed by defendant at the time of trial.

agreement" (dealers would sell Panther 440's back to the distributor rather than sell them at less than wholesale price).[2] The snowmobiles were being sold at the height of the snowmobile sales season rather than at the end thereof when substantial discounts might be expected; defendant admitted having asked Hurn, after hearing the price, whether the machines "were stolen or what the deal was"; that he took the snowmobiles knowing them to be new but without warranties, and paid for the machines in cash, but received no bill of sale or receipt. The State also points to defendant's first, admittedly false statement to police as indicative of defendant's guilty knowledge, and additionally cites the agreement made between Hurn and defendant that defendant would not mention Hurn's name if questioned by the police.[3]

The defense asserts that these facts are not incompatible with defendant's innocence. Defendant was the head of a large real estate agency with an active, young sales force of about 20. His home, on the edge of a forest preserve, was a center of recreational activity (including snowmobiling) for his sales people. He claimed that when he was contacted on October 6 regarding snowmobiles, he thought they could be used on his property or he might allow the sales people in on a good deal. Jay Hurn was defendant's friend of 6 or 7 years and the two had gone on recreational trips together. Both Hurn, who testified for the defense, and defendant stated that defendant did not converse with anyone other than Hurn regarding the purchase of the snowmobiles. When Hurn called on the night of October 6, he explained that the price of the new Panther 440's was $550 each without warranties, and defendant, knowing that model to be a good snowmobile with a value of approximately $1050 and feeling that this price was a "good deal," was in fact prompted to ask Hurn if the machines were stolen or "what the deal was." Hurn's testimony reveals that his own suspicions had been allayed when his seller, a trap-shooting acquaintance of some 2 years who was a former deputy sheriff of Boone County, told him it was an insurance deal which had been checked out by the Boone County sheriff or sheriff's department. Hurn testified that he passed this information on to the defendant, after which defendant agreed to take one snowmobile and indicated he might take more after he had a chance to inspect the machines. LeRoy Palmer, a distant relative and long-time friend of Hurn, testified that Hurn had made him a similar offer and explanation on October 6.

---

[2] There was no evidence to show that defendant had knowledge of any "sell-back agreements."

[3] The police had already removed the stolen snowmobiles from defendant's garage, to his knowledge, and defendant was thus already himself implicated at the time of making this agreement.

On the morning of October 7, Palmer and Hurn drove to Cordray's home. Palmer testified that it was daylight as they approached, and as he looked across the field toward Cordray's property he could see men unloading snowmobiles out of a truck. At Cordray's, Palmer and Hurn picked up two snowmobiles, in crates, and took them, according to Palmer, to Jay Hurn's driveway around 10 a.m. There they uncrated and inspected one of the snowmobiles. Palmer decided that he wanted to purchase one also and the two returned to Cordray's. According to defendant's testimony, he arrived at Hurn's house during Hurn's absence, looked over the machines, and found them to be factory-fresh Panther 440's complete with instruction manual and warranty facts booklet.[4] He left a note written on the back of his business card tacked to Hurn's garage door, indicating he would take five of the machines. Hurn found the note and, during the afternoon of October 7, left a message at defendant's office saying that the snowmobiles would be delivered.

Hurn paid Cordray $450 in cash for each of the eight snowmobiles and testified that in his business he often pays cash, that he had sufficient cash at his house to make the payment, but that Cordray did not ask for cash specifically. Later that evening, defendant asked Hurn how he wanted to be paid for the snowmobiles; Hurn said, "I paid cash" and defendant replied, "That's fine with me."[5] During the same telephone conversation, Hurn, who was leaving then to go duck hunting, asked if defendant would like to go with him for the weekend, but defendant declined because he could not leave his business on such short notice. The next day defendant left the money in payment with Mrs. Hurn.

The events of the week following delivery are, we believe highly relevant in determining if defendant was shown to be guilty beyond a reasonable doubt of obtaining the snowmobiles under such circumstances as would reasonably induce him to believe them stolen. The machines were stored, with serial numbers intact, in defendant's garage, clearly visible, through the transparent plastic, to those having occasion to look into the garage. One of defendant's salesmen testified that he saw them there.[6] Defendant testified that he believed all of his salesmen knew about

---

[4] Apparently the computer warranty registration cards, which show the machines' serial numbers and which must be completed and returned to the manufacturer to perfect the warranty, were not present.

[5] Hurn testified that he would have taken defendant's check if it had been offered instead of cash.

[6] Hurn's and Palmer's snowmobiles were likewise left uncovered with serial numbers unaltered in their respective garages, and there was testimony to the effect that Palmer's smowmobile was turned in to police in extremely dirty condition because his garage door was broken, would not shut, and his children took the opportunity to climb from the garage's earth floor onto the machine and play upon it in their dirty shoes. ("The open display by the defendant of the stolen goods negatives guilty knowledge." *People v. Rubin*, 361 Ill. 311, 328 (1935).)

the machines inasmuch as he himself had mentioned them, and such knowledge was corroborated by at least two of his salesmen (one of whom is no longer in his employ). Defendant stated that his children were very proud of the snowmobiles and told "everyone in school" about them. Sometime during the week of purchase and prior to defendant leaving for Puckaway on the hunting trip, one of his salesmen, Dick Lund, mentioned to defendant that there were stolen snowmobiles in the area. According to defendant's testimony, he assured Lund they were not his snowmobiles because his came from an insurance deal through a friend. He also testified that he told Hurn the rumor about stolen snowmobiles as they were riding toward Wisconsin on October 13, and Hurn reassured him that the deputy sheriff involved had checked them out with the sheriff's department or the sheriff, and they were "O.K." Later that evening, when Hurn's wife called to report the newspaper story of the stolen snowmobiles, Hurn reassured her that he did not think that had anything to do with his machines, but, defendant stated, he had the impression Hurn was just trying to make his wife feel better at that time.[7] Defendant and Hurn apparently talked and worried somewhat about it that evening, played cards and retired early. The following morning they hunted from daybreak until 10 a.m., took a nap, and hunted again from 4 p.m. until dark. When they returned to their hunting cabin, there was a message for defendant to call his wife and, upon calling her, she informed him that the police had picked up the snowmobiles. The two left for Rockford within 30 minutes of the call. Defendant testified that he called Lt. Truitt that afternoon, October 14, and left a message to return the call. (Although Truitt had no record of such a call, he indicated at trial that such a message from defendant might well have been overlooked, since at that time he was receiving a great number of calls as the snowmobile case was breaking.) On the way back to Rockford, Hurn and defendant "conceded" to each other that the snowmobiles were stolen and defendant agreed not to implicate Hurn until the latter had had a chance to talk to his attorney. It was as a consequence of this agreement, defendant testified, that he "tried to tell exactly what happened without involving Mr. Hurn" when he talked to police on October 15. On October 18, Hurn had already given a statement to the police and, defendant stated, since he no longer had anyone to protect, he gave his second statement. This statement, though it omitted the fact that defendant's wife had called him in Puckaway on October 14, is in all material respects consistent with his trial testimony, the testimony of LeRoy Palmer and Hurn, and with Hurn's written statements of October 16 and October 18.

---

[7] This testimony, we believe, indicates that at this point he was no longer completely convinced that their snowmobiles were part of an insurance liquidation.

Defendant testified that he was reasonably knowledgeable about snowmobiles, having bought two of them within the year prior to the incident in question; that because a friend owned a Panther 440, he knew it to be a good machine (although not particularly well suited to the area) and that he knew his friend had paid about $1050 for that model. (Such purchase price at less than retail was shown by later evidence to be fairly common for this model in the Rockford area during that snowmobile season, although perhaps not so early in the season as the date of defendant's purchase.) Defendant knew snowmobiles regularly sold for considerably less than retail price for, in fact, his first snowmobile, a 300cc 15" track machine, was sold to him for $799. He assertedly was told that that price was less than retail for the machine itself, despite his having received a package deal comprised of the snowmobile, a trailer worth $140, a cover worth $30 to $40, a case of oil worth $20, and various smaller items worth somewhat over $20. (An invoice for this machine, as well as photos of it, were entered into evidence and the State did not contest defendant's statements regarding its retail price.) His personal experience with buying snowmobiles for substantially less than retail was reconfirmed in January of 1971 when he purchased his second, which he claims to have been the "Cadillac of snowmobiles," a Grand Prix 440 (1970 model) with a speedometer, tachometer, cigarette lighter, chrome skiis, hood and electric starter. His uncontradicted testimony indicated that he paid $995 for this machine which retailed for $1680, and that this price included the electric starter, a $100 item with which the stolen snowmobiles were not equipped. His invoice and photos of the Grand Prix 440 were likewise entered into evidence.

Defendant further testified that one of his sales associates, Bob Irwin (a former employee and a stockholder in the Insurance Liquidator's Corporation) had on a prior occasion told him of a truckload sale of snowmobiles through that company—Polaris 400's, 35 h.p. machines— available for between $400 and $500. Defendant's witness, John Hart, owner of Insurance Liquidators, confirmed that in February of 1971, his firm offered three types of new Polaris snowmobiles, including Chargers, and Voyagers. He stated that he had purchased these machines for $375 and $400 each respectively, and "although they didn't sell very well * * * finally disposed of them" at $550 each for the Voyagers, the Chargers for a little less. (Another defense witness, a dealer in Polaris brand snowmobiles, stated that the Voyager was a somewhat larger, more expensive snowmobile that the Panther 440 and that the Polaris Charger was comparable in engine size, track, and "everything" to the Panther 440.) In the winter of 1970-71, defendant went to the local Sutherland Lumber Company in response to their ad for a Wheel Horse Snowmobile (a 300+ cc, 30 h.p. machine which defendant believed to retail for

between $1000 and $1100) at a sale price of $500. This testimony was corroborated by the assistant manager of Sutherland Lumber Company who stated that the machines were offered without warranty and that his competitor's price on that model was $988.

Although the price at which the snowmobiles were purchased was substantially below that which defendant admits he believed they were worth, snowmobiles with comparable specifications were proved to have been sold new that same year in the Rockford area at comparable "savings" and defendant claims such sales were within his knowledge. All the evidence indicates that defendant, an established local resident and businessman, dealt exclusively with a long-time friend, Jay Hurn, who had no arrest record and who was also an established local resident and businessman.

■■ As we recently pointed out in a factually similar case, "[w]ithin this context a low price is certainly not an indication that the merchandise offered was stolen, as it might have been between strangers, or in dealing with someone whose reputation was suspect. The circumstances in this case do not raise the usual 'red flag' that might be indicated by a bargain price under ordinary circumstances." We further pointed out in that case that "the unavailability of a warranty is not * * * a suspicious circumstance where the merchandise comes through a 'sub-market' or insurance liquidation sale rather than through an authorized dealer." *People v. Deery*, 41 Ill. App. 3d 302 , 310-11 (1976).

■■ Although the price may have raised some suspicion, indicated by defendant's query of Hurn as to whether the snowmobiles were stolen, Hurn's reassurances that his personal friend, a former deputy sheriff with the Boone County sheriff's department, had "checked the deal out" would, we believe, have reasonably allayed the suspicions defendant might have had because of the low price. The unfortunate fact that a member, or former member of the sheriff's department was directly involved in procuring stolen snowmobiles gives an imprimatur of legitimacy to the negotiations which must be considered a substantial factor in determining whether defendant received stolen property under such circumstances as would reasonably induce him to believe it stolen.

■■ The circumstantial evidence that defendant knew he was receiving stolen goods—that he paid substantially less than retail, bought them without warranties from a person not regularly in the business of selling snowmobiles, paid for them in cash, received no bill of sale or receipt, and made a false statement to the police in an admitted attempt to shield Hurn's involvement—is not of the kind, considering all the circumstances, which excludes every reasonable hypothesis other than guilt and which points clearly and conclusively to the fact that defendant received the stolen property under such circumstances as would

reasonably induce him to believe that the property was stolen. Our decision is supported by the testimony of multiple character witnesses, witnesses of prominence and long standing in the community, who attested to the good reputation of the defendant. We find that the words of the court in *People v. Rubin*, 361 Ill. 311, 330 (1935), are entirely apposite in this case.

"While in the case at bar there are some circumstances and facts tending to create the suspicion that the defendant is guilty, yet there are many facts and circumstances which, when considered with the good reputation of the defendant so clearly proved, tend to establish his innocence. The case against the defendant is so inconclusive that it becomes our duty to reverse the judgment of conviction."

Judgment reversed.

GUILD, P. J. and SEIDENFELD, J., concur.