THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HUGH DEERY, Defendant-Appellant.

Second District (2nd Division)   No. 75-26

Opinion filed August 16, 1976.

John F. McNamara, of Rockford, for appellant.

Philip G. Reinhard, State's Attorney, of Rockford (Daniel D. Doyle, Assistant State's Attorney, Edward N. Morris and Phyllis J. Perko, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

The defendant was charged with a violation of section 16—1(d) of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 16—1(d) (receiving stolen property). He was found guilty by a jury and was sentenced to a one-year period of probation.[1] The defendant appeals his conviction on the following grounds:

(1) That the indictment failed to charge an offense;

(2) that the indictment was defective in that it failed to include an essential element of the offense of receiving stolen property, that is, that the defendant knew at the time he received the stolen property that it was stolen;

(3) that reversible error was committed when the trial court allowed the State to examine State's witnesses with respect to dealings with people other than the defendant relative to the stolen snowmobiles;

---

[1] This case was tried in Kane County after a defense motion for a change of venue from Winnebago County was granted.

(4) that the State failed to prove the defendant guilty beyond a reasonable doubt.

The first issue stated has been resolved by our supreme court in the case of *People v. Dickerson*, 61 Ill. 2d 580, which reversed the decision of this court in *People v. Dickerson*, 21 Ill. App. 3d 977. Counsel conceded at oral argument that defendant was waiving this issue in view of that supreme court decision.

In order to understand the remaining issues raised by the appeal, a brief recital of the circumstances which resulted in the charge being brought is essential. The testimony established that the defendant had bought the property consisting of several stolen snowmobiles from Dale Finch. It was uncontradicted that Finch and the defendant had been acquainted for some 27 years, and Finch testified that the defendant was "one of my best friends." Both Finch and the defendant were businessmen in the city of Rockford. Finch had formerly been a contractor but for some 18 months preceding the sale of the stolen property he had been the owner and operator of a motel. The defendant was, at the time of the transaction in question, the owner and operator of the Rockford Speedway. Previous to that he had been an insurance adjuster and later operated a gas station. He had served two times as alderman of the city of Rockford. (1961-1969). The defendant and Finch apparently met through their wives, who had gone through nurses' training together and had remained friends thereafter. The testimony indicated that both the defendant and Finch were in the habit of picking up bargain merchandise here and there at reduced prices for resale. The defendant purchased various items at reduced prices from Finch over a period of years, which Finch had purchased at various "sub" markets. In September of 1971 the defendant, as was his custom, attended the annual "closeout" sale at Wolff Company in Chicago. The defendant described Wolff as a "sort of super wholesaler." He had previously bought things from Wolff. At the Wolff show on this occasion he saw snowmobiles for sale in truckload lots at a price of from $430 to $530 each, depending on how many were purchased, but not less than a truckload could be bought. He testified he considered buying a truckload and selling them to his friends, retaining one or two for his personal use, but finally decided that the servicing and financing of a whole truckload of snowmobiles would be too difficult and he did not buy the machines.

The defendant testified that a few days later he visited his friend, Dale Finch, at the latter's motel in connection with the possible purchase of the said motel by the defendant's brother. During this visit he mentioned the bargain snowmobiles to Finch, who responded that he himself had just bought some snowmobiles which he could sell at a price of around $550 each. The defendant agreed to buy a machine at that price. He

testified he asked Finch at that time where the snowmobiles came from and Finch said it was "a deal like insurance liquidators." He also testified he asked about papers for the machines and Finch said the papers would be forthcoming. Finch also told the defendant the names of several other persons known to the defendant to whom Finch had sold one or more of the machines. A few days later, the defendant testified, Finch delivered four snowmobiles to the Rockford Speedway. The defendant drove in just as Finch was leaving and protested, saying he had not ordered four machines, but Finch said he had to get the truck back right away and that he would call the defendant the next day. Of the three extra machines, one was purchased by an associate of the defendant and two were sold to an acquaintance of another associate. Defendant testified emphatically that he was unaware and had never been informed by Finch or anyone else that the snowmobiles were stolen.

Finch testified for the prosecution under a grant of immunity, he having been convicted of interstate transportation of stolen property previous to the defendant's trial and having been given a suspended sentence in Federal court. His testimony agreed with that of the defendant so far as their mutual friendship was concerned and their previous dealings in reduced price merchandise on a somewhat casual basis without receipts being given. However, his testimony as to the transaction in question differed in some important respects from that of the defendant. Finch said that the first talk with the defendant about snowmobiles was when he called the defendant and told him he was "hung with a load of hot snowmobiles" and had to get them out of Sassman's warehouse. He testified, "and I asked him if I could store a couple out to the Speedway." According to Finch's testimony this conversation occurred within a day or two or possibly three days after the snowmobiles were delivered to Sassman's warehouse, that is between October 5 and October 8. Finch said the defendant told him he "could put one or two out there." Finch, within a few days afterward, delivered four machines to the Rockford Speedway. According to Finch he then had a conversation with the defendant a day or two later at Finch's motel in which the defendant asked him if he could get more snowmobiles. Finch said that at that time he told the defendant he could not get any papers for them and the defendant said that was all right that "he didn't need a birth certificate" for the machines. The defendant denied this and also denied that he met with Finch after the initial delivery of the machines at the Speedway. Finch testified that some days after the initial delivery at the Speedway he met with the defendant and two of his associates, Burdick and Scott, at Finch's motel and discussed the possible purchase of additional snowmobiles. All three, the defendant, Scott and Burdick, denied this. Scott said he went alone to the motel to pick up the skis which had been

missing from the snowmobile he purchased when it was delivered to the Speedway but that there was no conversation about the source of the snowmobiles at that time as testified to by Finch. Burdick testified that after he bought one of the machines which had been delivered to the Speedway he promised his machine to Don Elmore and as this left him without a machine he then went to see Finch at his motel and asked him if there were any more machines for sale. He testified he was alone at that time except for his nine-year-old son and this was the only direct contact he ever had with Finch. He further testified that Finch told him at that time that the machines were from a liquidation sale or else he had heard this elsewhere, he is not sure, but he was certain that Finch had never told him the machines were stolen. The testimony of the defendant, Scott and Burdick, therefore, directly contradicted Finch's testimony on the point of a joint meeting at the motel following the delivery at the Speedway, as well as his having informed the three that the snowmobiles were stolen.

We now proceed to a consideration of the remaining issues raised by the defendant. However, for reasons indicated below, we will momentarily pass by the second issue raised in this appeal dealing with the standard of proof set out in section 16—1(d) of the Criminal Code and resolve first the issues having to do with the admission of evidence and the question of reasonable doubt.

During the testimony of the witness Finch, who testified under a grant of immunity, he was permitted to testify over objection that he told other persons who approached him or whom he approached about buying one of the snowmobiles that the machines were stolen. Also, the witness Busekros, president of a local snowmobile club, was allowed to testify over repeated objections by defense counsel that he had met Finch around October 5, 1971, at a restaurant for the purpose of buying several snowmobiles from him. Busekros further testified that he had with him about $5,000 he had withdrawn from his savings account to make the purchase but after talking with Finch he did not buy the machines but left and redeposited the money in his savings account. Defense counsel objected strenuously to this testimony as being irrelevant to the issue of defendant's guilt and was overruled. Defense counsel then on cross-examination asked the witness whether he had been turned off by the price or something else, to which the witness replied that he had not been turned off by the price asked. On redirect examination the State's Attorney then asked what it was that had dissuaded him from buying the machines and Busekros replied, "Mr. Finch told me they were stolen."

The defense contends the testimony of both Finch and Busekros as to Finch's dealings or attempted dealings and his conversation in the course thereof with third persons is irrelevant, collateral to the question being tried—which was the guilt or innocence of Hugh Deery—and was

definitely prejudicial to the defendant in raising a false inference. The testimony of Busekros that he took money out of his savings account with the intention of buying snowmobiles but did not go through with the purchase naturally raised the implication that he was turned off at the last minute by Finch's candid admission that the machines were stolen. The defendant contends that Busekros was called by the State for this purpose only and that the inference which was raised was that since Finch had told Busekros the machines were stolen he had also so informed the defendant. Defendant contends this prejudiced him in the minds of the jury.

Two questions are raised by this assignment of error: (a) Was the testimony relevant and admissible and (b) if not relevant and properly admissible, was it so prejudicial to the defendant as to constitute reversible error?

■■ As to relevancy, we are of the opinion the testimony had no bearing on the guilt or innocence of the defendant himself and was therefore irrelevant and improper as raising an unnecessary and collateral issue. Busekros had no connection with either Finch or the defendant and did not buy a machine. If he was called as a State's witness for the purpose of revealing that he had been told by Finch that the machines were stolen we think this was an improper purpose and the testimony was impermissible for that purpose. The question then remains, was the testimony as to the conversation with Busekros and others relating to snowmobiles which were offered for sale prejudicial to the extent of amounting to reversible error?

The State, on oral argument in this court, more or less conceded that the testimony in question was improperly admitted, but argued that it was harmless error inasmuch as the defendant had an opportunity to counter it with his own witnesses who testified they had not been so informed. However, as pointed out by defense counsel, there were references made to other persons who had contemplated buying or did buy the stolen machines and were told by Finch, according to his testimony, that the machines were stolen. These persons were not called as witnesses. Moreover, Scott and Burdick, who testified for the defense, not only were business associates of the defendant, one of whom, Scott, assisted in unloading the machines when they were delivered, but themselves were purchasers of the machines so that their testimony that they were not informed that the snowmobiles had been stolen was of reduced credibility. It is obvious, therefore, that the impact of Busekros' testimony was not countered by that of the defendant's witnesses.

The crucial issue at the trial was the defendant's knowledge that the property was stolen. The only testimony tending to establish guilty knowledge on the defendant's part was (a) Finch's testimony that he told

the defendant the snowmobiles were stolen and (b) the inference arising from Finch's testimony and that of Busekros that Finch told Busekros and other prospective purchasers of this fact and therefore must have told the defendant. Eliminating the testimony of Busekros—which we believe was improperly admitted—the only direct evidence against the defendant on the ultimate question of his guilty knowledge was the statement of Finch that he informed the defendant the property was stolen. The question of credibility as between Finch and the defendant would, without Busekros' testimony, have been one man's word against another and it seems probable that in that situation the defendant's word would have been more credible. The defendant was a respected and apparently successful businessman who had a good reputation in the community and had held the office of alderman in Rockford for eight years with no evidence of any scandal being adduced against him so far as the record indicates. There is no evidence that he had ever been in trouble of any kind. Many witnesses vouched for his good reputation for truth and veracity in the community. Finch, on the other hand, was testifying under an arrangement with the State's Attorney to grant him immunity from State charges in return for his testimony, he having already pleaded guilty to a Federal charge of interstate shipment of stolen property. All other things being equal it would seem the defendant clearly had the superior credibility. However, there was the added impact on defendant's credibility of the fact that Busekros had undoubtedly been advised by Finch that the snowmobiles were stolen and thus Finch's testimony that he had informed all prospective purchasers of this fact, including the defendant, was given considerable psychological support by the testimony of Busekros. The jury might well ask themselves why should he tell Busekros and not tell his good friend, Deery? But the very posing of this question reveals the maze of collateral issues implicit in the admission of the Busekros testimony. For example, the testimony of both Finch and the defendant clearly established that they had done business with each other for many years on a rather casual basis, mostly for cash paid and no receipts given. Under these circumstances the defendant was much more apt to be brushed off with a meaningless answer when he inquired as to the source of the machines than Busekros, to whom Finch was a stranger. We do not know, because there was no testimony, as to how sharply Busekros questioned Finch, but there is no reason to suppose that he was as gullible with a stranger as the defendant would naturally be with a friend. The difference in the relationship between Busekros and Finch on the one hand and the defendant and Finch on the other was so great as to nullify the inference that Finch was asked and answered the same questions in the same way in both cases, of any logical support as corroborative evidence.

The inference that what Finch told Busekros he likewise told the defendant is thus unwarranted, and is the result of a contrived connection growing out of irrelevant testimony. In a prosecution for receiving stolen property where the defendant is a person of good reputation the issue of guilty knowledge sometimes has to be resolved on a very slight difference in credibility between the accuser and the accused. We are not prepared to say that the jury's respective assessments of the credibility of Finch and the defendant was not influenced by the testimony of Busekros. His testimony was completely believable, and the admission of said testimony after objection by defense counsel was overruled may well have given it significance in the eyes of the jury sufficient to have weighed in their decision. This, in addition to the appearance of objectivity of the State's evidence, was certainly prejudicial and may well have proved decisive in a case where the only other direct evidence was of dubious quality. While the State contended the error, if any, was harmless, we do not so regard it. We believe the law in Illinois as to harmless error in a criminal case was correctly stated in the recent case of *People v. Lewis*, 18 Ill. App. 3d 281, 285, where the court said:

> "In order to determine error to be harmless, we must believe, based upon the facts and circumstances disclosed in the record, that it was harmless beyond a reasonable doubt. [Citation.]"

Under this statement we must consider whether beyond a reasonable doubt the result would have been the same if the reference by Finch to his having informed other buyers that he had told them that the property was stolen, and the direct testimony of Busekros that he was so informed by Finch, had been eliminated from the case. In view of the weakness of the State's case without it we would not be warranted in concluding that the testimony of Busekros had no effect on the jury, and we do not, therefore, concede that it was harmless error.

■■ Inextricably bound up with our conclusion that the testimony objected to was more than harmless error is the remaining question as to whether the testimony in any event was sufficient to convict the defendant beyond a reasonable doubt.

If we eliminate from consideration the irrelevant testimony of Finch as to his dealings with others, not witnesses or parties, and the irrelevant testimony of Busekros we have left (1) the direct testimony of Finch that he informed the defendant the snowmobiles were stolen and (b) the attendant circumstances of the transaction as the evidence against the defendant in this case. We have already commented on the respective credibility of the defendant and Finch, and it is clear that Finch's testimony alone would not prevail over the defendant's beyond a reasonable doubt. Eliminating the irrelevant testimony we must then look for the rationale of the jury's verdict in the circumstantial evidence. What

does this consist of? It consists of (a) the inadequate price; (b) the lack of warranty papers and (c) that the payment was in cash with no receipt given.

It is true that one of the indications that property has been stolen is a great disparity between its market value and the price at which it is offered. Yet, everyone is aware that prices of specialized machinery and appliances vary greatly from the "list" price when they are offered for sale at so-called "discount" houses or at auction sales, especially when offered in quantity. If a manufacturer or dealer is overstocked with a particular model or type of machine, he may wish to liquidate his inventory by offering such merchandise at "distress" prices in one of the "sub-markets." Also, there is always on the market bankrupt stocks and insurance salvage, many times in the original cartons. The testimony of the defendant that he saw and was tempted to buy a load of snowmobiles at the "Wolff" show in Chicago because of the low price—comparable to what he actually paid Finch for a machine, was not only not contradicted but was confirmed by the witness, Stanley Valiulis, a local business executive, who noticed the same sale in Chicago and testified that the same snowmobiles could be bought in carload lots for prices ranging from $450 to $750. The defendant, his wife, and Finch himself all testified that the defendant was a man with a sharp eye for a bargain and that he had bought many items from Finch as well as at the sub-markets in Chicago at greatly reduced prices. As the defendant testified, he liked to barter and had been doing it for many years. Aside from the fact that the defendant knew that snowmobiles were being offered in a sub-market in carload lots for a fraction of their list price, he had known Finch for some 25 years, they having been introduced through their wives, who were personal friends, and he had purchased many articles from Finch with no repercussions over a long period of years. So close had been the relationship over the years that they were godparents of each others children. Within this context a low price is certainly not an indication that the merchandise offered was stolen, as it might have been between strangers, or in dealing with someone whose reputation was suspect. The circumstances in this case do not raise the usual "red flag" that might be indicated by a bargain price under ordinary circumstances.

The same observations pertain to the cash payment and the lack of a receipt. Given the customary mode of doing business between the two— and in fact, as was testified to by other witnesses as to their dealings with the defendant—it would have been highly unusual for a receipt to have been given. Both Finch and the defendant testified that cash payment and no receipt was the usual order of business between them. In view of the history of their dealings we find no basis for suspicion in the lack of a receipt. As to the failure to give warranty papers, there was a conflict in

the testimony of Finch and the defendant. While Finch said he told Deery he would not furnish any papers, Deery testified he told Finch he needed the papers in order to register the machine and Finch told him the papers would be forthcoming. The unavailability of a warranty is not, in any event, a suspicious circumstance where the merchandise comes through a "sub-market" or insurance liquidation sale rather than through an authorized dealer.

On the other hand, there were several factors which would indicate a lack of guilty knowledge. Disregarding the relationship between the parties, the open manner of the delivery of the machines to the defendant's place of business and the subsequent removal of them to a friend's garage for assembling, and the open conduct of the defendant in putting his two associates in touch with Finch and telling them to pay Finch direct, all these are factors which, while not conclusive, are inconsistent with guilty knowledge. We have alluded to the factor of credibility before, but one aspect of Finch's testimony deserves special comment on this point. Finch testified that the snowmobiles arrived at Sassman's warehouse on October 5. He reached the conclusion, at least by the next day, in talking to Brown, who was evidently the go-between, that the machines had been stolen. There is some inconsistency in his testimony as to whether he was aware of it before this. In any event, he testified that he called Hugh Deery the next day or a day or two after the machines arrived, which would be at the latest on October 8—and told Deery that he was "hung with a load of hot snowmobiles" and needed some place to store them. On October 9, at least a day after this alleged conversation, Lewis Gilbert, a respected member of the bar and the defendant's personal attorney for many years, received, according to his own testimony, a telephone call at about 9 a.m. from the defendant telling him [Gilbert] that defendant knew of a bargain in snowmobiles if Gilbert would be interested in buying one. It strains credibility to believe that a day or two after being informed that the snowmobiles Finch had for sale were stolen, the defendant would have phoned his family lawyer and friend of long standing and solicited him to buy one of the "hot" machines. The sequel of this is also significant as bearing on guilty knowledge. Three or four days later, around October 13, the story of the theft of some snowmobiles from a Minneapolis warehouse and their suspected presence in the Rockford area broke in the newspapers and Gilbert immediately phoned the defendant asking if he could have gotten involved with the stolen machines. Gilbert testified that the defendant replied that he did not think so because he had bought his machines from his friend, Dale Finch. Gilbert urged him to contact Finch immediately to check into it and when the defendant tried to do so his telephone calls were not returned. It was not until then, he testified, that he became

suspicious of Finch, at which time, at the urging of Gilbert, he contacted the police about the possibility of his having a stolen machine in his possession.

It is entirely unbelievable that if Finch phoned his friend, Deery, telling him he had to conceal some "hot" snowmobiles, that Deery would immediately phone his personal lawyer and friend of long standing to suggest that he buy one of the machines and then a day or two later tell his lawyer there was no reason to suspect their source because it was from his good friend, Dale Finch. This sequence of events is so inherently improbable as to throw grave doubt on Finch's testimony that he informed the defendant the machines were stolen by calling him and telling him he needed a place to store some "hot" snowmobiles. We can only conclude the jury overlooked the significance of this sequence of events in evaluating the respective stories of Finch and Deery. Moreover, it would have to be supposed that the defendant was willing to expose his friends and associates, Scott and Burdick, to criminal penalties without any motive, even financial, since he told them to pay Finch direct for the machines if they decided to purchase any. This would be both callous and irrational, and the personal reputation and record of the defendant as an alderman and as a good citizen in the community belies such an attitude.

While we are reluctant to reverse a criminal conviction based on a jury verdict we do not believe the evidence in this case is sufficient to sustain the conviction beyond a reasonable doubt.

We have left to the last our comment on the defendant's contention that the indictment is defective because, in strictly following the wording of section 16—1(d) of the Criminal Code, defining theft, it would allow a conviction based on certain circumstances which do not necessarily reflect guilty knowledge. Section 16—1(d) reads:

"A person commits theft when he knowingly:

\* \* \*

(d) Obtains control over stolen property knowing the property to have been stolen by another *or under such circumstances as would reasonably induce him to believe that the property was stolen.*" (Emphasis added.)

The wording "or under such circumstances as would reasonably induce him to believe that the property was stolen," was added by an amendment in 1967 and is apparently a codification of the language used in several previous decisions of our supreme court. See, for example, *People v. Mulford*, 385 Ill. 48, 58, where the court used the same standard of proof in its opinion:

"[B]ut the guilty knowledge might be inferred from facts in evidence if at the time they received the hogs they knew facts as shown by the evidence which would impress an ordinary

reasonable man that the property had been stolen, and if the defendants received the property under such circumstances as would satisfy a man of ordinary observation, intelligence and caution that it had been stolen, the jury would be authorized to find that the defendants knew that fact."

The defendant contends that such language in the cases was only intended as an evidentiary guide for the jury and the extreme codification of this principle, by adopting it as a general law, results in "an unconstitutional modification of that essential element [of guilty knowledge] and a lessening of the accepted burden of proof upon the State."

In view of our resolution of the two other issues raised by this appeal—that is, the admission of improper and prejudicial testimony and the failure of the evidence adduced at trial to prove the defendant's guilt beyond a reasonable doubt—the conviction in this case must be reversed. Since it is not necessary for us to do so, we do not consider the issue raised as to the constitutional validity of subparagraph (d) of section 16—1 of the Criminal Code (Ill. Rev. Stat. 1973, ch. 38, par. 16—1(d)).

The judgment of the trial court is reversed.

Judgment reversed.

T. J. MORAN, P. J., and DIXON, J., concur.