THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HORACE K. JACOBS, Plaintiff in Error.

*Opinion filed February 16, 1910.*

1. CRIMINAL LAW—*record must be free from substantial error if evidence of guilt is conflicting.* If the evidence of guilt in a prosecution for murder is conflicting, the record must be free from material and substantial error in order to sustain a conviction.

2. SAME—*when it is error to permit State's attorney to attempt to discredit witness.* Where a witness called by the People in a murder trial answers questions fairly and is apparently a willing witness, although his testimony is favorable to the defendant, it is error to permit the State's attorney to attempt to discredit his testimony by improper insinuations and imputations.

3. SAME—*what action in the examination of witnesses is error.* Where the physicians who examined the wounds of the deceased when he was taken to the emergency hospital after his affray with the defendant give testimony favorable and highly material to the defendant, it is error for the court, after refusing to admit in evidence a certain letter offered by the People, to permit the State's attorney, by insinuations and questions, to get before the jury the fact that the letter contained a criticism by the grand jury of the examination made by one of the physicians.

4. SAME—*when statement by the court is erroneous.* Where a question asked of a witness in a murder trial is objected to by the defendant upon the ground that it erroneously assumed that the witness had previously testified to a certain material fact, it is error for the trial judge to state, in effect, that the witness had so testified, particularly where the record discloses the contrary; and such error is not cured by a mere direction to the jury to disregard the statement and go entirely by their own recollection of the testimony.

5. SAME—*what instruction in murder trial is erroneous.* Where the defendant in a murder trial contends that the blows which he struck were in self-defense and it is a controverted question of

fact whether the deceased died from the injuries so inflicted, it is error to give an instruction which the jury might well understand as holding that the defendant did not act in self-defense and that the deceased did die as the result of the injuries inflicted by the defendant.

CARTWRIGHT and HAND, JJ., dissenting.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. WILLIAM H. McSURELY, Judge, presiding.

The plaintiff in error and Oscar Nelson, Herman Wilson and Charles Howard were indicted for murder at the March term, 1909, of the criminal court of Cook county. The indictment charged that the defendants assaulted one William Winters on March 15, 1909, and inflicted injuries from which he died on March 18, 1909. Each of the defendants entered a plea of not guilty and they were tried jointly. At the close of the State's case in chief the court instructed the jury to find defendant Howard not guilty. The trial having proceeded against the other defendants, the jury found the defendant Wilson not guilty and the defendants Nelson and Jacobs guilty of manslaughter. Nelson and Jacobs each moved for a new trial. The motion of Nelson was granted, and thereupon the State entered a *nolle prosequi* as to him. The motions by Jacobs for a new trial and in arrest of judgment were overruled and he was sentenced to the penitentiary. He brings the record of the criminal court here by writ of error.

For some time prior to March 15, 1909, Winters had been a lodger at the Vestibule Hotel or lodging house at 99 VanBuren street, in the city of Chicago. Howard was employed as watchman for the fourth floor, Jacobs and Wilson were clerks in charge of the hotel office and Nelson was an employee of the place. It is not denied that there was a fight between Winters and the defendants on the fourth floor of the lodging house shortly before four o'clock on the morning of March 15, and that plaintiff in error

struck Winters over the head and on various parts of the body with a club. There is some conflict in the evidence as to who was the aggressor, the plaintiff in error, Jacobs, contending that he struck Winters in self-defense. After the fight Winters was taken by the defendants from the fourth floor to the hotel office, on the first floor of the building, when Jacobs summoned two police officers, who placed Winters under arrest and took him to the Harrison street police station. He was bleeding profusely from wounds on his head, and upon his arrival at the station he was placed in the emergency hospital conducted in connection with the police station, for examination and to have his wounds dressed. Dr. Clarence H. Wall was the physician then in charge of the emergency hospital and was called on the trial as a witness on behalf of the defendants. He testified that when Winters was brought into the emergency hospital he was handcuffed and was fighting and struggling; that his head, face and hands were covered with blood; that the witness washed off the blood and made an examination to discover the extent of the injuries; that he examined his nose, and there was no fracture or abrasion; that there was no hemorrhage of the ears, no discoloration about the eyes and no evidence of contusion or swelling over the left temporal bone; that he found two scalp wounds,—one on top of the parietal bone and the other on the back of the head; that he treated these wounds by shaving off the hair around them, cutting down to the bone with a sharp scalpel, scraping back the periosteum for the purpose of determining whether there was a skull fracture, putting two stitches or sutures in each wound and placing a collodion dressing over the wounds. He testified that he found no skull fracture and no symptoms indicating skull fracture. While Winters was receiving this treatment he vomited, and in the vomit the doctor detected the odor of alcohol. On the conclusion of this examination Winters was turned over to the two officers

who had arrested him and placed in a cell. That day he was arraigned in the Harrison street police court charged with the violation of an ordinance of the city and fined $15 and costs, which he paid and left the station.

Nothing was shown as to the movements or whereabouts of Winters until the morning of March 16, when he was seen in the office of the Vestibule lodging house. On the afternoon of March 16 he was found in his room on the fourth floor of the lodging house in a delirious condition. The police were again summoned, and Winters was taken on a stretcher to the same emergency hospital. The doctor in charge of the emergency hospital when Winters was taken there the second time was Dr. Charles D. Wall, a brother of Dr. Clarence H. Wall. Dr. Charles D. Wall was called as a witness by the State, and he testified that Winters was brought to the hospital about 4:45 o'clock P. M. on March 16; that he was unable to answer any questions; that the witness made an examination and washed out the stomach; that he found two scalp wounds on the upper part of the head, in the parietal region, covered with collodion dressing; that he removed this dressing and disclosed the wounds, which contained stitches. The examination of Dr. Charles D. Wall covered a period of from an hour to an hour and a half in time. The witness looked for evidence of skull fracture, concussion of the brain and similar troubles, but found nothing to indicate fracture. He found the contents of the stomach to contain alcohol. There was no blood coming from his ears nor from his nose or throat. He testified that he examined the nose and found no fracture and no abrasion there; that he did not observe that the eyes were blackened, and that the two scalp wounds were the only objective injuries which he observed. These he re-dressed. Pursuant to the directions of this witness Winters was removed to the Cook county hospital, where he was examined by a number of physicians, only one of whom (Dr. Carter) was called as

a witness by the State. Dr. Carter testified that he examined Winters at the hospital on the evening of March 16 and found him in a semi-delirious condition and unable to answer any questions; that he and the other doctors at the hospital were unable at that time to make a positive diagnosis, but that it was later diagnosed as a case of cerebral spinal meningitis; that the witness found two scalp wounds on the head, which had been dressed; that no abrasion was observed over the bridge of the nose or on the forehead and that the eyes were not blackened; that there was no discharge from the ears or hemorrhage from the nose. While this witness testified that Winters died at 12:45 A. M. on March 18, he was not present at the time of the death and had not seen the patient since some time during the evening before.

When Winters was first taken to the Cook county hospital he was placed in a ward but soon thereafter was removed to a private room, where he was constantly in charge of an attendant or nurse. With the exception of Dr. Carter no one connected with the Cook county hospital who observed Winters or who attended him while he was there was called to testify.

Dr. Warren H. Hunter, coroner's physician of Cook county, was called as a witness by the State and testified that on March 18 he made a post-mortem examination of a body at the Cook county morgue which had been represented to him by one James Williams, of 2345 Clark street, as the body of William Winters. Williams was not called as a witness, and no witness was called to show how this body, if it was the body of William Winters, was conveyed from the Cook county hospital to the morgue. Dr. Hunter testified that he made a very exhaustive examination of this body for the purpose of finding evidences of injuries. He kept a minute written memorandum of what he found. This memorandum was used by the witness during his direct examination and was later admitted in evidence on the of-

fer of the defendants. Dr. Hunter testified that he found a fracture of the temporal bone on the left side of the head about three inches long, above and a little in front of the ear; also a subdural hemorrhage over the left temporal region, caused by the laceration of the middle meningeal artery; that both eyes were blackened and the nose fractured between the eyes, the fracture extending upwards through the skull to the brain; that there were various contusions and abrasions on different parts of the body. The witness testified that he was certain none of the wounds on the head had been dressed or contained any sutures or stitches, and he gave it as his opinion that there was nothing to cause death outside the brain condition, and that death was caused from shock and hemorrhage due to external violence. In his post-mortem examination the witness removed the skull cap, but he testified that he had discovered the fracture of the nose by examination before opening the parts.

During the progress of the trial and on April 15, 1909, by order of the court, the body upon which the witness had performed this autopsy was exhumed, and Dr. Hunter, among others, examined it. He discovered and pointed out a number of the contusions and abrasions which he had noted at the time of the autopsy, and also the fracture of the skull, but upon being recalled to the stand he did not testify to having found any skull wounds on the back of the head which contained stitches and from around which the hair had been removed.

No one was called as a witness on the trial who had known Winters previous to the time of his encounter with the defendants on the morning of March 15 except the defendants themselves, and it does not appear that they had ever seen the body upon which Dr. Hunter performed the autopsy. Mossie Joel testified, on behalf of the State, that he was present at the time of the trouble between Winters and the defendants at the Vestibule lodging house on

March 15, which was the first time he had ever seen Winters; that on the morning of March 16 he saw Winters walking around the lodging house; that those were the only two times he had ever seen Winters when living; that on the morning of March 19 he saw a body at the county morgue which he identified as that of Winters. The witness was one of those present when the body upon which the autopsy had been performed was exhumed and he identified it as that of Winters. William J. Bailey, one of the police officers who arrested Winters on the morning of March 15 and who never saw him alive except on that occasion, and William E. Collins, another police officer who had seen Winters once in his lifetime, both testified that they were present at Waldheim cemetery when this body was exhumed and recognized it as the body of the man they had known as William Winters.

ALBERT A. KRAFT, and BENSON LANDON, for plaintiff in error.

W. H. STEAD, Attorney General, and JOHN E. W. WAYMAN, State's Attorney, (JUNE C. SMITH, and JOHN E. NORTHUP, of counsel,) for the People.

Mr. JUSTICE COOKE delivered the opinion of the court:

Plaintiff in error contends earnestly, and not without reason, that the evidence does not support the verdict by that degree of proof required in a criminal case. The evidence as to some of the material matters was conflicting, and it was the peculiar province of the jury to weigh it and to determine the credibility of the witnesses. As the credibility of two of the witnesses was improperly attacked by the State and substantial error was committed in other respects during the progress of the trial, we will not pass upon the question whether the evidence was sufficient to support the verdict. There being a conflict in the evidence

as to the guilt of the plaintiff in error, in order to sustain the verdict it must appear that the record is free from material and substantial error.

It is not denied that the fight occurred or that the defendant Jacobs struck Winters over the head and body with a club. It is contended, however, both that Jacobs acted in self-defense and that the injuries inflicted by him did not cause the death of Winters. Whether the wounds which caused death were inflicted before the examinations of Winters by the Drs. Wall at the emergency hospital and by Dr. Carter at the Cook county hospital, or whether the body upon which the coroner's physician, Dr. Hunter, performed an autopsy was that of Winters, were questions of the highest importance in determining the guilt or innocence of the defendants, and they were entitled to have them fairly submitted to the jury.

Dr. Charles D. Wall, who examined Winters on the afternoon of March 16, the second time he was taken to the emergency hospital, was called as a witness by the State. His examination and observance of the man extended over a period of an hour or an hour and a half. He observed two scalp wounds on the upper parietal region of the head, which he re-dressed. He observed no symptoms to indicate a fracture of the skull and is positive in his statement that there was no skull fracture. Not being able in the time at his command to make a complete diagnosis he sent Winters to the Cook county hospital. Upon being recalled by the State this witness was interrogated as to a letter which had been sent by some person or persons to his superior in the health department. The witness produced the letter and it was examined by the court, who refused the offer of the State to put the same in evidence. The assistant State's attorney asked the witness a long series of questions as to the contents of the letter; whether it called his attention to his conduct of this case; whether he knew, at the time he was

testifying previously, that his conduct had been officially criticised; whether he had made any explanation in response to this letter, and whether the letter had been turned over to him by his superior in the ordinary course of business. The court sustained objections to all these questions, but the action of the State's attorney in thus attempting to cross-examine and discredit his own witness, when considered in connection with his cross-examination of the witness Dr. Clarence H. Wall, which we will note later, must have inevitably operated to the prejudice of the defendants. During the examination the court required the witness to state, over the objection of the defendants, whether he had been reprimanded by his superior officer after the receipt of the letter. The State's attorney also asked the witness the following question in reference to the letter: "As a matter of fact, this communication calls attention to your conduct of that case, doesn't it, particularly?" To this question the defendants objected and the court sustained the objection, whereupon the assistant State's attorney remarked, "Well, it does." Upon motion of defendants this remark was stricken from the record. This statement, made by counsel with the letter before him, when taken in connection with the whole of this cross-examination of his own witness and the cross-examination of the defendants' witness Dr. Clarence H. Wall in reference to the same letter, was improper, and the action of the court in striking it from the record did not cure the error.

Dr. Clarence H. Wall was the physician in charge of the emergency hospital at the time Winters was first brought there, immediately after his arrest. He was not called by the State but was produced as a witness by the defendants. After testifying to the facts as detailed in the statement of this case he was cross-examined by the State's attorney in reference to this same letter, for the pretended purpose of showing his interest. The cross-examination was conducted, in the main, along the same lines as the

examination of Dr. Charles D. Wall, and while objections
to nearly all of the questions were sustained, the witness
was required to testify, over objections, that the letter was
sent to Dr. Evans with reference to the treatment of Win-
ters by the witness and with reference to the fact that he
did not discover any fracture. A number of the questions
sought to elicit the fact that the witness had seen a letter
criticising his actions in this matter, and he was asked
whether he had told Dr. Carter about the predicament he
was in on account of it. Finally the State's attorney asked
him, "Were you aware that you were criticised by the
grand jury of Cook county for your examination of Win-
ters?" and the court having overruled the objection of the
defendants to the question, the witness answered, "Sure;
I read the letter."

While the letter is not before us and the name of the
writer is not disclosed by the record, it is evident from the
examination of these two witnesses in reference to it that
it contained a criticism by the members of the grand jury
of the examinations of Winters made by the Drs. Wall,
and that the only purpose of the State in offering it in evi-
dence was to get this criticism before the jury. The action
of the court in excluding the letter is inconsistent with the
ruling requiring the witness to give his opinion as to the
effect of its contents. This attempt to discredit the testi-
mony of the two witnesses was improper. The methods
of impeachment are well known and well defined, and the
State's attorney should have availed himself of them if
there were grounds for impeachment, instead of attempt-
ing to discredit the witness by improper insinuation and
imputation. In calling Dr. Charles D. Wall as a witness,
the State, in effect, represented him to the jury as a cred-
ible person and one worthy of belief. So far as can be
observed, he was a willing witness and answered every
question fairly. The State had no right, under the circum-

stances, to attempt to cross-examine him, much less to attempt to impeach him.

That the testimony of these two witnesses was material and the question of their credibility of the highest importance can be readily seen. Dr. Clarence H. Wall testified that he made a minute examination of Winters immediately after his arrest; that he found no fracture of the skull, no abrasion on or injury to the nose, no discoloration about the eyes and no hemorrhage of the ears; that he did find two scalp wounds on the back part of the head, which he treated by shaving the hair from around them, putting two stitches or sutures in each wound and dressing them with collodion. Dr. Charles D. Wall testified that he found no evidence of skull fracture, no injury to the left temporal bone, no discoloration about the eyes and no abrasion on or injury to the nose, but that he did find the two scalp wounds on the back of the head, each containing two stitches, which he re-dressed. Dr. Hunter, the coroner's physician, testified that upon the body upon which he performed an autopsy, and which was represented to him as being the body of Winters, he found an abrasion of the nose, a fracture of the nose between the eyes, various abrasions and contusions over the body and a fracture of the left temporal bone. In his opinion the fractures of the nose and left temporal bone caused death. Although Dr. Hunter made a thorough examination and preserved notes of each injury found, his notes did not disclose the existence of the scalp wounds described by the Drs. Wall, and he testified that he was certain there were no sutures or stitches in any wound on the head. When the body claimed to be that of Winters was exhumed during the progress of the trial, Dr. Hunter was present and again noted evidences of these injuries but he did not testify to having found these scalp wounds. The contention of the defendants on the trial was, on the one hand, that the body examined by Dr. Hunter was not that of Winters, and, on the other, if

it was the body of Winters, that his death was caused by injuries other than those inflicted by the defendant Jacobs and from which he was suffering up until the time he was taken to the Cook county hospital. The facts within the knowledge of the Drs. Wall were material on both these points, and the defendants were entitled to have their testimony presented to the jury free from any improper imputation. The court erred in permitting the State to examine these witnesses in reference to this letter or its contents.

Dr. Hunter was called by the State and testified that as coroner's physician he had, on March 18, made a post-mortem examination of a body which had been represented to him to be that of Winters. He was positive in his statement that there were no scalp wounds on this body, and particularly none containing stitches or sutures. Later, Dr. Hunter was recalled by the State for further examination, and was asked whether, during the month of March, he had performed an autopsy "on any other man who had scalp wounds as you have stated in this case." Counsel for the defendants objected to that part of the question which assumed that the doctor had testified this body had scalp wounds, on the ground that the doctor did not so testify, whereupon the following occurred:

The court: "Don't you remember he put his hand right along here (indicating) to show where they were?"

The witness: "I don't recall, your honor."

The court: "Well, I recall."

To these statements of the court the defendants objected and excepted. As we have above pointed out, the question whether these scalp wounds were present on the body examined by Dr. Hunter was very material, and it was error for the court to state, in the presence of the jury, his recollection of what the witness had testified to in that regard, and particularly in view of the fact that the record discloses that the witness had testified directly to the contrary. While it is true the jury heard the testimony of

Dr. Hunter and are presumed to remember it correctly, still, where there is a difference of opinion as to what has been testified to, the jury would undoubtedly attach great importance to the statement of the court thus emphatically made. The effect of this statement is virtually the same as an expression by the court of an opinion on the facts involved. Dr. Hunter was again recalled by the State after the body claimed to be that of Winters had been exhumed, and at the close of his testimony on this occasion the court made the following oral announcement to the jury:

"Gentlemen of the jury, I want to make a statement at this time. My attention was called to the fact by counsel for the defendants that I had made some statements of what Dr. Hunter had said in his testimony. You should ignore that entirely. That should be stricken from the record. You want to go entirely by your own recollection of what was said, and not by what the court may inadvertently say about what any witness has testified."

This statement did not cure the error. Even if the error could be remedied in this manner, it will be observed that the court failed to state that he was mistaken as to the scope of Dr. Hunter's testimony, and while the jury are told to disregard the statement, they are left to infer that the court still believed that the testimony of the doctor was as he had stated it. The statement of the court made during the examination of Dr. Hunter was wholly unnecessary in ruling on the objection, and we think it was most damaging to the defendants.

Plaintiff in error complains of the eighth instruction given on behalf of the State. The instruction is as follows:

"The court instructs the jury further, as a matter of law, that the law presumes that a person intends all the natural, probable and usual consequences of his acts; that when one person violently assails another, not in self-defense, and not in a sudden heat of passion which is caused by a provocation apparently sufficient to make the passion

irresistible or involuntary, and not to prevent the commission of a known felony upon either the person or property of such assailant or another, and not to prevent entry into the habitation of another by one who manifestly intends to enter the same for the purpose of violently assaulting or offering personal violence to some person dwelling or being therein, and the life of the party thus assailed is actually destroyed in consequence, then the legal and natural presumption is that death or great bodily harm was intended, in which case the law implies malice, and such killing would be murder."

In this case, self-defense was relied on as one of the defenses, and it is contended that in such a case, and in a case where it is a controverted fact as to whether or not the life of the party injured is destroyed in consequence of the injury, it is error to give this instruction, for the reason that it assumes both that the deceased was assailed not in self-defense, and that his life was actually destroyed in consequence of the assault. If the jury had been told in express terms that defendants did not act in self-defense and that Winters died as a result of the injuries inflicted by the defendants it would have been error. We believe this instruction may have been so understood by the jury, and for that reason should have been refused.

The refusal of the court to give to the jury defendants' instruction No. 2 is complained of. This instruction is, in substance, the same as defendants' instruction 25 given, and it was not error to refuse it.

For the errors indicated the judgment of the criminal court is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

CARTWRIGHT and HAND, JJ., dissenting.