(No. 23942.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ABE RUBIN, Plaintiff in Error.

*Opinion filed April 16, 1937.*

WILSON, J., dissenting.

JOHN E. NORTHUP, and WM. SCOTT STEWART, for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, JOHN T. GALLAGHER, MELVIN STARKLE REMBE, BLAIR L. VARNES, and RICHARD H. REGAN, of counsel,) for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

In the criminal court of Cook county Abe Rubin was convicted of receiving stolen property and sentenced to the penitentiary. The conviction was reversed by this court and the cause remanded because of the insufficiency of the evidence to establish his guilt. (*People* v. *Rubin,* 361 Ill. 311.) Upon a re-trial with a jury, he was again convicted and received a like sentence. A writ of error prosecuted by him again brings the cause here.

The store of Julius Siegel, a dealer in women's garments, had been burglarized on the night of September 24, 1933. A large number of the stolen articles were found in defendant's place of business on January 12, 1934, and taken under a search warrant. He claims to have purchased them in the regular course of business on October 18, 1933, from Ben Morris, whom he knew as a dealer in the cloak and suit trade. The other facts appear in the former opinion of this court, and, with the exceptions hereinafter noted, the testimony was substantially the same on both trials. In our former opinion we held that while there was some testimony tending to create a suspicion of defendant's guilt, yet there were many facts and circumstances which, when considered with his good reputation clearly proved, tended to establish his innocence. Defendant urges that the evidence in the last trial is not only insufficient to

establish his guilt, but that it shows his innocence. In determining these questions it is necessary to examine the differences between the testimony on the two trials. Before considering that phase of the case, we will note some of the other grounds urged for reversal. Among them are numerous instances of alleged prejudicial conduct of the trial judge and of the State's attorney.

At the last trial defendant introduced in evidence (1) a bill of the goods, which he claims he bought from Morris, showing a payment of $250, signed "B. M."; (2) a receipt for $200 dated December 9, 1933, similarly signed; and (3) four sales-record cards showing, in appropriate columns, consecutive numbers of one hundred and forty-four garments received from Morris, with the dates and amounts of those sold. On Rubin's cross-examination it was shown that the exhibits were not offered in evidence at the first trial. On re-direct examination he testified the attorney who then represented him had them in his possession. He offered to show they were not used because his attorney said it was not necessary. The testimony was refused. The court remarked: "Well you have shown his lawyer had them and could have offered them. I think that is sufficient." In the argument the prosecutor stated the exhibits either did not exist or his attorney was ashamed to submit such rubbish to a judge, but that a jury might be fooled by them. The denial of the right to explain a fact developed on cross-examination in such a way as to create an unfavorable inference was highly prejudicial. (*People* v. *Jacobs*, 243 Ill. 580; *Morton* v. *Zwierzykowski*, 192 id. 328.) No objection was made to the argument and if that was all that is complained of, it might afford no ground for relief; but to draw out an unfavorable fact, prevent any explanation of it, and then enhance the prejudice by such argument, does not comport with our view of a fair trial guaranteed to every accused person, whether he is innocent or guilty of the charge against him.

Over defendant's objection, the prosecution was permitted to argue that Rubin did not produce his employees to testify because they knew the goods were "hot," and would not have anything to do with the matter. There is no showing that the witnesses were not as accessible to the People as to the defendant. Under an analogous situation we said in *People* v. *Mundy*, 280 Ill. 32: "No duty devolved upon plaintiff in error to call anyone as a witness. It was his privilege to produce witnesses and to make a defense or not, as he chose. The duty devolved upon the People to prove his guilt beyond all reasonable doubt before a jury were warranted in convicting him. The duty did devolve upon plaintiff in error not to put it without the power of the People to produce any material witness, and if he did so, the People had the right to show that fact as a circumstance against him. No such situation is presented here. To say that it was the duty of plaintiff in error, under the law, to produce witnesses who were equally accessible to the People and who were supposed to be in possession of facts having a bearing upon the truth or falsity of the charge against him would be placing a burden upon him that the law does not require or tolerate. Such a rule would be in conflict with the doctrine of the presumption of innocence."

Although we said in our former opinion: "The circumstance that Morris was not produced by the defendant does not militate against the defendant's case," the prosecuting attorney, in his argument, excoriated defendant for a failure to produce Morris, and said it would be the best thing he could do to prove his innocence, but he had not done it. While defendant did not object to the argument, we can not pass it unnoticed in view of what we said when the case was previously before us. The prosecutor knew of the holding, and moreover, the testimony on the part of defendant shows he had made extended efforts to locate Morris.

Agnes Scheu, a bookkeeper for the Bijou Dress Company, testified to record-entries of sales by that company to Morris. During her testimony the court remarked that she knew nothing about it except that there was a record, and, over objection, entered into an extended and searching cross-examination of the witness that was calculated to lead the jury to think the court did not believe her testimony. This was prejudicial to the defendant. (*People* v. *Scowley,* 353 Ill. 330; *People* v. *Schultz,* 300 id. 601.) The witness afterward returned to the stand with complete records, but this fact would not remove the impression that the court was suspicious of her testimony.

On both trials, it appeared that after the burglary Siegel first saw one of his coats being worn by a woman on a street car. Although there is no testimony to show that the coat was ever in Rubin's possession or that he knew anything concerning it, Siegel was permitted to testify to its value, and the prosecutor made the statement that Rubin sold it. Objections were interposed but the witness was permitted to answer. Being no part of the *res gestæ* this was improper and prejudicial.

We come now to consider the sufficiency of the evidence to justify a conviction. On the last trial an exculpatory statement made by defendant to the police shortly after his arrest in January, 1934, was introduced in evidence by the People. It was not used in the former trial, and the prosecution claims that two allegedly false answers to the police furnish additional evidence of his guilt not shown at the first trial. During his examination by the police, he was asked: "Some officers visited your store to-day with a search warrant and after searching the premises described in the warrant they took a number of ladies' dresses, coats, suits and hangers, that were identified by Mr. Siegel, the complainant in this case, as being his property. Can you tell us how long this merchandise has been in your possession?" He answered: "Anywhere from two years up

to date." He was then asked: "From whom was this merchandise purchased?" to which question he replied that a good part of it was purchased from a man known to him as Morris. He was also asked whether he paid Morris by cash or check and replied: "I believe part by check and part by cash." It is urged that the answers were false because he testified on the trial that he purchased the Siegel goods on October 18, 1933, and the payments made were in cash. Immediately prior to these questions he was asked his occupation, what kind of a store he kept, how long he had been in business, and whether he owned the store or worked there. He answered that he was a storekeeper, the business was a ladies' ready-to-wear store, he had been in business all his life and was manager for Rubin's incorporated. On his cross-examination at the trial he testified that when the statement was made his answer as to how he paid was his belief at that time, and he had no opportunity to check his records. He also testified that he did not know whether or not all the articles taken to the police department were goods that Siegel lost; that he saw them piled up and brought in the police wagon, but was never given an opportunity to examine them. Just prior to the question as to how long he had the merchandise, he was talking about the store and the character of the business. That fact, and the fact that he did not know whether all the goods taken under the warrant were Siegel's, tend to show he had in mind the entire stock of merchandise. This view is strengthened by the fact that he mentioned part of it as purchased from Morris. At any rate, the purchase was within the time stated, and to say that a merchant must remember offhand the dates of his purchases when suddenly arrested and under the mental strain that would naturally follow, would be unreasonable. We do not think it can be said, with any degree of certainty, that Rubin knowingly made a false statement to the police in either of the particulars claimed.

At the last trial, Siegel testified the goods were worth $4000 when they were taken, and that when he valued them at $2000 on the first trial, he meant they were of that value when found in defendant's possession. On the previous trial he testified they cost him $2000. The testimony, including that of Siegel, shows that a large part of them was outmoded at the time of the burglary. It is impracticable within the limits to which an opinion should be confined, to review all the testimony as to the value of the goods. A review of it discloses the same failure as at the previous trial to establish that the goods were bought at a price so far below their value as to indicate guilty knowledge of their having been stolen.

At the first trial, Ralph Rubin, Siegel's attorney, testified that while the searching party was in the basement vault of the store, defendant tore tags off the Siegel garments hanging there and put them in his pocket, and when they were demanded, threw them on the floor. Siegel also testified that Rubin was busy trying to remove the tags. Ralph Rubin died before the last trial and a transcript of his testimony at the former trial was admitted in evidence. It is largely discredited by Emma Salitan, a People's witness, who testified that she and the others of the searching party were down there some time; that they all stood close together and she saw no price tags and heard no conversation about them, and that they all left the vault together and went upstairs. At the last trial, Siegel did not testify that Rubin pulled off any tags, but his testimony was merely as to what Ralph Rubin told him.

Louis R. Connell, a new witness for the defendant, testified that he met Morris at the Fort Dearborn Hotel twice before the Rubin trouble. Several other witnesses, as on the previous trial, identified Morris as connected with the cloak and suit trade, and had dealt with him. A larger number of witnesses than on the prior trial, testified to defendant's good reputation. He has never been previously

charged with any infraction of the law. He produced documentary evidence of his dealings with Morris. In many respects his defense is more complete than at the first trial, while, as we have pointed out, the People's case is not as strong. Many circumstances tend to show defendant is innocent of the charge. Under the evidence in the record, and in view of our former holding, the trial court should have directed a verdict for defendant.

The cause has been tried twice. Some of the prejudicial errors mentioned no doubt influenced the jury in their deliberations. Without a stronger case against the defendant, a conviction cannot be allowed to stand. If there were further testimony for the prosecution it is reasonable to presume it would have been produced. Under these circumstances, to subject defendant to another trial would be unjust.

The judgment of the criminal court is reversed.

*Judgment reversed.*

Mr. Justice Wilson, dissenting.