THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JAMES SAUNDERS, Defendant-Appellant.

Second District   No. 82—681

Opinion filed March 22, 1984.

Peter B. Nolte, of Rockford, for appellant.

Daniel Doyle, State's Attorney, of Rockford (Phyllis J. Perko and Cynthia N. Schneider, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, James Saunders, was charged by information in Winnebago County on January 27, 1982, with one count each of three Class X felonies: home invasion, rape, and deviate sexual assault. (Ill. Rev. Stat. 1981, ch. 38, pars. 12—11, 11—1, 11—3.) He was convicted by a jury of all three offenses, and he was sentenced to three concur-

rent terms of 40 years in the Department of Corrections.

The defendant raises three issues on appeal: (1) whether he was denied his constitutional right to reasonable bail which infringed on his ability to prepare a defense; (2) whether he was deprived of a fair trial due to improper cross-examination by the court and prosecutor, and improper closing argument; and (3) whether the court abused its discretion in permitting impeachment of the defendant with a seven-year-old conviction for attempted rape.

At the time of the offense on January 12, 1982, the victim, a 22-year-old single woman, resided alone in her apartment at 1901 Auburn Street, Rockford, Illinois. That morning, she was preparing to go to work at a beauty shop where she was employed as a hair dresser and her first appointment was scheduled for 10 a.m.

Testimony at the trial by the victim established that at approximately 9:45 a.m., she went outside her apartment and started the engine of her car to permit it to warm up. She then re-entered her apartment and shortly thereafter heard a knock at the front window. She thought she recognized the profile of her landlady, and she opened the door and found herself confronted by a man, later identified as the defendant, who was unknown to her. He was wearing a parka, and had a scarf around his face. He held up a yellow post card which was addressed to another resident in the building. As the victim opened the door, the defendant asked the victim if the card was hers, and as she began to answer him, the defendant took a step forward through the door and struck her in the face with his fist. The impact caused the victim to fall on her back in the living room.

Trial testimony further established that the defendant then held a pillow over the victim's face, and began rummaging through her purse. He then made her pull her ski jacket up over her face so that she was unable to see, and pushed her into the bedroom where he threw her onto the bed. He then cut the clothing from her body with a knife, tied her wrists with an electrical cord and bound her to the bed.

Over the next two hours, the defendant held her captive in her apartment where he repeatedly beat her, raped her, forced her to masturbate herself, and to perform fellatio on him. He also forced her to lie on her back in the bathtub where he stood over her, urinated on her face and into her mouth, and spit on her.

About 11 a.m., a neighbor in the same building heard screaming, and knocked at the victim's and several other doors, but received no response. When she left the building shortly thereafter, she noticed the victim's car was running in the parking lot. She subsequently re-

ported the incident to a police officer. About noon, Rockford police officers went to the front door of the apartment, and knocked and rang for more than 10 minutes, until a supervisor arrived and authorized a forced entry into the apartment. As one of the officers was climbing through a window, the defendant opened the front door of the apartment, while repeating several times the word "emergency." He was arrested, and the police officers entered the bedroom where they found the victim nude on the bed crying hysterically, her face covered with blood from cuts on her head. She was hospitalized with a broken nose, a swollen face, head lacerations which required stitches, and badly bruised wrists.

The defense at trial was consent and that the defendant was under the influence of drugs: alcohol, marijuana, and psilocybin, an hallucinogen. He testified at trial that he had known the victim for about five months, that he had had sex with her about four or five times, and had borrowed her car on two or three occasions. He testified he received money from her for participating in her sexual bondage fantasies, and that when she could not pay him on the date in question, he became angry and hit her, causing her to fall into the bathtub where she struck her head on the bathroom fixtures, aggravating the injury.

## ISSUE I. BAIL REDUCTION

The defendant's bail initially was set at $500,000, was reduced to $200,000 after a hearing on his motion for bond reduction, and was subsequently reset *ex parte* at $500,000 following the preliminary hearing. He asserts he thereafter attempted to obtain a bond reduction hearing in order to present evidence "on the question of what was reasonable, as well as show the effects of the defendant's incarceration on the preparation of the defense," but the court denied the motion. He alleges the State presented no evidence at any stage of the proceedings below that the defendant would fail to appear in court if released on bail, but merely suggested that the probability of a long penitentiary sentence created the likelihood of the defendant's flight prior to trial. He contends the court's bail order was entered solely on the basis of the nature of the offense and the potential penalties and, as such, the order was improper. From the statement in ABA Standards relating to pretrial release, section 2.5(D) (1974) that "money bail should be set no higher than that amount reasonably required to assure the defendant's appearance in court," the defendant infers, and so argues, that it was improper for the court "to set bail at a sum clearly without [beyond] the reach of the defendant." The

only purpose of the excessive $500,000 bail, he argues, was to keep him confined prior to trial, thus preventing him from locating certain witnesses who would tend to corroborate his defense in that they would testify he had known the victim prior to the date of the alleged offense. He urges his conviction be reversed, and that reasonable bail be imposed to enable him to assist in the preparation of his defense.

The State asserts this issue is not cognizable in this court on direct appeal following conviction, since Supreme Court Rule 604(c) provides for interlocutory review of bail orders before conviction. (Supreme Court Rule 604(c), as amended August 9, 1983, effective October 1, 1983.) It points out the record shows the defendant availed himself of this remedy following the court's May 26 order denying bond reduction. In this court's order filed in the circuit court on June 12, 1982, the defendant's "Motion for Review of Order Refusing to Modify Bail" was denied.

The record in this court of cause No. 82—434 shows the defendant filed copies of the bond reduction motions filed by him in the circuit court on March 4, May 3, and an addendum thereto filed on May 26, 1982. The defendant additionally filed copies of petitions signed by friends and relatives which were filed in the circuit court supporting the reduction in the defendant's bond, expressing their willingness to supervise his release, guarantee compliance with any of the conditions imposed on release, and assure his appearance in court. Lastly, the defendant filed an affidavit of his trial counsel in support of his motion for review. The motion prayed for release on his own recognizance, or reduction of the bond.

The State filed an answer to the defendant's motion, appending thereto the affidavit of the State's Attorney of Winnebago County in opposition to reduction of the bond, setting out in full the factual background of the case, including a copy of the victim's seven-page statement.

In reply to the State's argument here, the defendant states there is nothing in the language or history of the rule in question which indicates that it was intended to be exclusive. He attempts to argue that after this court denied his motion to review bail, another motion for reduction of bail was presented to the circuit court which was not included in this court's earlier review, and that this court could not adequately assess the full impact of the pretrial incarceration of the defendant without reviewing the entire record.

The defendant's assertion in this regard is not supported by the record. No motions to reduce bail appear in the record which were filed after this court denied the motion to review bail. Further, Su-

preme Court Rule 604(c) provides that any party may move to have the transcript of the record filed with the appellate court. This was not done by the defendant below.

■ We believe the State's position on this issue is correct. Contrary to the defendant's assertions, the history of Supreme Court Rule 604(c) supports the State's argument that this issue is not cognizable on direct appeal in this court in view of the defendant's prior interlocutory appeal. After a bail order is entered, a defendant may first seek review in the circuit court for grant, reduction, or modification of bail or its conditions under section 110—6 of the Code of Criminal Procedure of 1963. (Ill. Rev. Stat. 1981, ch. 38, par. 110—6.) Review of that order may then be obtained in the appellate court under Supreme Court Rule 604(c). Prior to the adoption of Supreme Court Rule 604(c) in 1971, a defendant's only avenue of relief was an original petition to the supreme court for a writ of *habeas corpus*. (*People v. Kelly* (1975), 24 Ill. App. 3d 1018, 1032.) The *Kelly* court observed that the adoption of the rule followed the decision in *People v. Harris* (1967), 38 Ill. 2d 552. There, the supreme court determined that the defendant could not raise the issue that his application for bail had been improperly denied for, "[b]oth as a practical matter and a procedural matter, review of an order denying bail must be raised prior to trial and conviction." (38 Ill. 2d 552, 555.) There the defendant had argued that he was denied a constitutional right, and the appeal was his first opportunity to raise the issue on review. The court wrote:

"An order denying bail is, of course, interlocutory and not appealable (*Lynch v. People*, 38 Ill. 494); but the issue could have been raised by *habeas corpus*. (*People ex rel. Sammons v. Snow*, 340 Ill. 464; *People ex rel. Smith v. Blaylock*, 357 Ill. 23.)" 38 Ill. 2d 552, 555.

The defendant's argument that a defendant "may" seek review under Supreme Court Rule 604(c), but is not barred from further review if he fails to do so, is incorrect. In *People v. Henderson* (1976), 36 Ill. App. 3d 355, 379, it was stated:

"The trial court's refusal to reduce bail before conviction was an appealable order at the time reduction was refused. (Ill. Rev. Stat. 1971, ch. 110, par. 604(c).) Defendant's failure timely to appeal that order now precludes any consideration of its propriety."

The defendant in *Henderson* also appealed the trial court's refusal to set any bail after conviction pending appeal. After noting that the defendant's sole remedy for that refusal was the procedure in Supreme Court Rule 609(b), the court stated:

"More importantly, neither order presents any ground for reversal of the instant convictions, and thus, is not properly before this court. *People v. Van Riper* [(1970), 127 Ill. App. 2d 394.]" 36 Ill. App. 3d 355, 379.

The remedy provided by Supreme Court Rule 604(c) is the defendant's sole avenue of relief in this court. Having once considered the issue on interlocutory appeal, this court has no authority to reconsider its own order. We note the defendant presents no argument on this issue that was not already included in his interlocutory appeal.

We conclude the issue is not cognizable in the context of this direct appeal.

Notwithstanding the above, a review of the issue on its merits reveals no error in this court's prior order. At the hearing on the defendant's January 14 motion for bond reduction, the court heard testimony from three character witnesses for the defendant, as well as testimony from the defendant and his wife. The State presented only one witness, a Rockford police officer whose testimony extended only to his objective observations of the physical condition of the victim and her apartment when he arrived on the scene. The court learned nothing of the events which preceded the rescue of the victim until the preliminary hearing which was held about eight days later. After hearing the victim's testimony, the court found probable cause, and the State filed its three-count information against the defendant. Originally, a six-count complaint was filed against the defendant, and an arrest warrant specifying bail at $500,000 issued. Bond was reduced to $200,000 on defendant's motion prior to the preliminary hearing.

Two days after the preliminary hearing, the court, on its own motion, under section 110—6 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 110—6), increased the defendant's bond back to $500,000. On the same day, the State filed its motion to reconsider and increase the defendant's bail. The court held a hearing to explain its reinstatement of the original $500,000 bond, and to allow the parties to present argument. In essence, the court indicated that until the preliminary hearing, it had no idea of the nature of the offenses nor had it considered that extended terms might be applicable at sentencing.

This court has not been provided with any kind of record—even a bystander's report—of what proceedings, if any, took place when the $500,000 bail was originally set on January 12, 1982. Based on the court's comments at the January 29 hearing, it is apparent its earlier reduction of the bond to $200,000 on defendant's motion did not fully

take into account the nature of the offenses charged, nor the fact that extended terms might be available as a result of the nature of those offenses, since the court was not fully advised in the premises until the preliminary hearing. Defendant concedes both of those considerations are relevant in determining bail. Ill. Rev. Stat. 1981, ch. 38, par. 110—5; *People ex rel. Sammons v. Snow* (1930), 340 Ill. 464.

■■ As pointed out by the State, the defendant's allegations concerning the difficulty in securing witnesses are conclusionally set forth. No facts are given from which it may be concluded that defense counsel had attempted to contact witnesses and been unable to do so. Defendant specifically named several witnesses at trial who he claimed saw him with the victim prior to the incident. Defense counsel never followed up on his own suggestion regarding funds for hiring a detective, even though the court indicated it would entertain a specific motion. Consequently, the increase in the amount of bail was within the discretion of the court. Although the bond set was a high amount, and the likelihood that the defendant could post even a 10% cash deposit was not great, the financial ability of the defendant is only one of the considerations the court must balance when setting bail. The record shows the court heard evidence at the bond reduction hearing and the preliminary hearing and allowed ample argument from the State and the defendant. All aspects which affect the determination of the amount of bail were presented to the court. The court's decision to reinstate the original $500,000 bond was a considered one; no hint of the arbitrariness or caprice which signals judicial abuse of discretion is evident. Assuming *arguendo* that this court would have jurisdiction to consider the matter, no reversal is warranted.

## Issue II. Fair Trial

■■ ■ The defendant claims the cumulative effect of several errors by the court and the prosecution was that he was deprived of a fair trial.

### A. IMPROPER CROSS-EXAMINATION AND CLOSING ARGUMENT BY PROSECUTOR REGARDING DEFENSE WITNESSES

The defense of consent here included the defendant's testimony that he had known the victim for about five months, had been introduced to her by someone named Brandon Garnett, that they went out for drinks, and to a motel. On cross-examination, the defendant was asked names and addresses of the people who could verify that he knew the victim before January 12, 1982, and, after each of the

defendant's four responses, was asked if the person was a defense witness. Defense counsel objected to the questions on the basis that it sounded as though the person was definitely, rather than potentially, a defense witness. Later, in closing argument, the prosecutor rhetorically asked if the defendant's story was truthful, whether it was reasonable for the jury to think that someone would be able to verify it.

The defendant admits no objections to the comments during closing arguments were made, but points out defense counsel did object to the initial cross-examination. He cites *People v. Popely* (1976), 36 Ill. App. 3d 828, 836, for the proposition that "this type of comment" will require a reversal even in the absence of an objection and even if there is sufficient evidence otherwise to sustain the verdict.

The State argues the error has not been preserved for review because no timely objection was made during closing argument and the issue was not specifically included in the defendant's post-trial motion. (*People v. Jackson* (1981), 84 Ill. 2d 350; *People v. Tannenbaum* (1980), 82 Ill. 2d 177.) Further, the basis for defense counsel's objection at trial during the cross-examination was made on a different basis from that asserted on appeal and, thus, does not preserve the issue for review. *People v. Miller* (1977), 55 Ill. App. 3d 136.

Alternatively, the State asserts the questioning and the prosecutor's remarks during closing argument were proper, analogizing the rationale underlying the rule regarding the failure to produce alibi witnesses to the instant case. Essentially, that rule is that when a defendant asserts an alibi defense and names persons in support of his alibi, the prosecutor may comment upon any failure to call those persons, for the reason the witnesses were interjected into the case by the defendant, and are deemed unavailable to the prosecution. *People v. Scott* (1980), 92 Ill. App. 3d 106; *People v. Crusoe* (1979), 79 Ill. App. 3d 778.

In reply to the State's argument regarding waiver, the defendant appears to suggest that the rule should not be applied since the record shows the defendant was dissatisfied with his counsel, and because this court has authority to consider matters not properly raised in a post-trial motion under Supreme Court Rule 615(a) (87 Ill. 2d R. 615(a)). We note here the defendant's argument concerning his dissatisfaction with counsel is a new issue raised for the first time in his reply brief. As such, it is in contravention to Supreme Court Rule 341, and requires no consideration by this court. 87 Ill. 2d R. 341.

The defendant argues the alibi exception rule should not be applied here because to do so would allow the State to comment on a defendant's failure to call witnesses to corroborate everything he tes-

tifies to regardless of its significance. Further, defendant disputes the State's assertion that the witnesses were inaccessible to it by stating that he "never testified to specific names of persons until questioned by the State, and that all the State had to do prior to trial was read the defense list of witnesses and interview these witnesses to find out what they are going to say."

At the outset, defendant's argument with regard to waiver is fairly supported by the case he cites, *People v. Popely*. This court may consider the issue as a matter of grace under Supreme Court Rule 615(a) (87 Ill. 2d R. 615(a)), in view of the fact the alleged error relates to the accused's substantial right to be presumed innocent.

Resort to the alibi witnesses rule is not necessary in this case, because it may be resolved by reference to the general rule which, essentially, is that it is improper for the prosecution to comment on the defendant's failure to present witnesses where such witnesses are equally accessible to both parties. (*People v. Rubin* (1937), 366 Ill. 195; *People v. Munday* (1917), 280 Ill. 32.) As a subsidiary application of that general rule, potential alibi witnesses interjected into the case by the defendant are *per se* deemed unavailable to the prosecution and comment with regard to failure of such witnesses to testify is proper. (*People v. Mays* (1972), 3 Ill. App. 3d 512.) In this case, the defendant asserts he never testified to specific names of persons until questioned by the State. However, defendant clearly testified on direct examination that he had been introduced to the victim by "Brandon Garnett" and that he went out with the victim on several occasions to have a drink or go to a motel. The names of three other witnesses who could say they saw the defendant with the victim prior to the date of the offense were then elicited on cross-examination: Joyce Scott, Dave Clanton (or Klanton), and "Juanita." The list of witnesses provided to the State by the defendant listed—in addition to the State's own potential witnesses—94 other witnesses. "Juanita," a salesperson at the Instant Jungle, was not shown at all on the list; no addresses were shown for Garnett, a male escort, or Clanton, an alleged drug dealer; Scott's address, shown as 708 Dickerman, was testified to by the defendant as being her "last known address." Defense counsel did not object to the eliciting of the names, only "to the phrasing which would indicate that possibly these were witnesses we intend to call at trial, either for our case in chief or for rebuttal." The prosecutor agreed "not to ask if the defense would produce those witnesses" and no further objections were made on this point during cross-examination or later during the prosecutor's closing and rebuttal arguments.

Defense counsel stated in his opening argument to the jury:

"There is another story, another story that we believe the evidence will show. We believe the evidence will show that contrary to what [the victim] indicated, she did know the defendant. In fact, she had had several dates with Mr. Saunders, and they had gone out.

Unfortunately, [the victim] is white and Jimmy is black. Friends and family are very strong for the feeling of [the victim] dating a black. So this was kept hidden.

During these sessions in which [the victim] would go out, they did not intend to go to the most prominent places in town. They tended to stay by themselves. And during these times, they would have sexual intercourse. And this sex got into a form of sex known as bondage."

The rule has been established that a defendant is not bound to produce any witnesses, and, where he does not testify to any attempt on his part to secure witnesses or as to his failure to secure them it is error to comment on his failure so to do. (*People v. Swift* (1925), 319 Ill. 359, 365-66; *People v. Langzem* (1923), 307 Ill. 56.) In *People v. Kubat* (1983), 94 Ill. 2d 437, 497-98, it was stated:

"[Only] limited comment has been approved as an exception to the general principle (see *People v. Munday* (1917), 280 Ill. 32) that it is improper to comment on defendant's failure to produce witnesses: '[I]f a defendant "injects into a case his activities with potential witnesses during a particular period of time ostensibly for the purpose of establishing an alibi ***, his failure to produce such witnesses is a proper subject of comment on the part of the State." ' [Citations.]"

In *People v. Munday*, that court stated:

"[T]he general rule is that the omission or failure of a defendant in a criminal prosecution to call as witnesses those who could testify of their own knowledge to material facts raises no presumption of law that if called they would have testified unfavorably to him, but the jury may consider his failure to produce or to endeavor to produce such witnesses as a circumstance in determining his guilt, provided it is manifest that it is within the power of the accused to produce such witnesses and that such witnesses are not accessible to the prosecution." *People v. Munday* (1917), 280 Ill. 32, 42.

The witnesses here, obviously, would not have been alibi witnesses, and consequently would not fall under the alibi witness exception to the general rule. However, they were witnesses who could testify of their own knowledge to a material fact; that is, whether the

defendant knew the victim. The victim specifically denied knowing the defendant, or having ever engaged in any of the sexual bondage "scenes" testified to by the defendant. Evidence offered to prove a proposition which is a matter in issue or which is probative of a matter in issue is material. (McCormick, Evidence sec. 185, at 434 (2d ed. 1972).) The matter in issue here was consent or lack of it. Certainly, the testimony of witnesses that the victim and the defendant knew each other would have had a great deal of probative value on the issue of consent.

From the record and the defendant's answers on cross-examination, it appears the witnesses who could verify the defendant's acquaintance with the defendant were not equally accessible to the State. The witnesses in question were not occurrence witnesses, and nothing in the record indicates an obvious connection with either the defendant or the victim. Consequently, we conclude the jury was entitled to consider the defendant's failure to produce or to endeavor to produce at least one of the four witnesses he identified at trial, as a circumstance in determining his guilt. It must be remembered the defendant brought up the name of Brandon Garnett, claimed him and Dave Clanton (with no addresses shown) as "additional witnesses" on his answer to discovery, did not list "Juanita" as a witness, but identified her at trial as a sales person at the Instant Jungle; and, despite stating that Joyce Scott was a defense witness, failed to produce her at trial.

Defendant testified he tried "desperately to find [Garnett]. What [Garnett] does is, you know, he hangs out at bars and whatever, as I understand it." Defendant also testified he could not find Garnett because he did not know his address; "Garnett is a part of a male escorting [*sic*] service that has since - - been identified with a prostitution ring in Loves Park." Further, when asked if Garnett is a defense witness, the defendant responded: "He was. There's a subpoena out for him, as I understand it. I don't know." In our opinion, this testimony substantially belies the defendant's secondary contention with regard to this issue; that is, that he was unable to secure the attendance of these witnesses due to his excessive bond. Defendant's testimony indicates that he certainly knew more about who the witnesses were and where they could be found than the State did. The jury was entitled to consider that not one of these witnesses, not even Joyce Scott, whose address was shown, testified for the defendant at trial.

In sum, we conclude the prosecutor's comments were not improper and no reversal on this issue is warranted.

## B. MISSTATEMENT OF THE LAW BY THE PROSECUTOR DURING REBUTTAL ARGUMENT

■ The defendant contends the prosecutor misstated the law during his rebuttal argument when he stated:

"And that he may have taken drugs, I don't know if that's true or not. But let's assume he had taken drugs. If the man had been drinking, if the man had been taking drugs, and drinking and taking drugs causes him to be so dangerous to do this to an innocent victim, that's his problem. And any time you have a rule of law that says it's no excuse to be so drunk or to be so on drugs that you would just be freed of any consequences of your actions, then I'd say we are in trouble. That can't be the law. He voluntarily took any drugs he took, if he took them. He voluntarily drank, and he is liable for the consequences when innocent people are hurt thereby."

The State argues this issue was waived due to the defendant's failure to either timely object to it or to raise it in his post-trial motion. (*People v. Jackson* (1981), 84 Ill. 2d 350; *People v. Tannenbaum* (1980), 82 Ill. 2d 177.) The cases cited by defendant in urging reversal even in the absence of an objection, *People v. Crossno* (1981), 93 Ill. App. 3d 808, and *People v. Johnson* (1981), 102 Ill. App. 3d 122, involved far more egregious examples of misstatement of the law than what we consider the rather ambiguous misstatement here.

We find the statement to be ambiguous due to the prosecutor's statement that "any time you have a rule of law that says it's *no* excuse to be so drunk" (emphasis added), was concluded by the comment, "[T]hen I'd say we are in trouble." In other words, the prosecutor actually said we are not in trouble if we have a law that says it *is* an excuse to be so drunk as to not know what you are doing. That is effectively what the defense of intoxication is: an intoxicated or drugged condition which negatives the existence of a mental state which is an element of an offense. Further, the errors in the *Johnson* and *Crossno* cases were one of several in those cases which were found to have cumulated to result in a denial of the defendant's right to a fair trial. This case does not present a similar cumulation of errors. The defendant has waived this issue, and plain error is not evident.

Voluntary intoxication is not a defense to general intent crimes. (*People v. Rosas* (1981), 102 Ill. App. 3d 113.) Deviate sexual assault and rape are general intent crimes, in that no specific mental state is required to be alleged. (See *People v. Gold* (1967), 38 Ill. 2d 510, 516, *cert. denied* (1968), 392 U.S. 940, 20 L. Ed. 2d 1400, 88 S. Ct. 2317.)

Further, the defense of voluntary intoxication has been specifically precluded as to rape. (*People v. Hunter* (1973), 14 Ill. App. 3d 879.) Consequently, the alleged misstatement could have had no effect as to those offenses since such a defense was not available.

In contrast, the offense of home invasion requires the specific mental state of intent or knowledge. (Ill. Rev. Stat. 1981, ch. 38, par. 12—11.) However, as the State argues, the evidence fails to show the defendant was so intoxicated as to have negatived his specific intent at the time the offense of home invasion was completed. Prior to coming to the victim's apartment, the evidence showed the defendant consumed a bottle of Cold Duck, which is a mixture of champagne and red wine, and two ounces of Amaretto, an almond-flavored liqueur. After arriving at the victim's apartment, the defendant testified he drank brandy, champagne, smoked marijuana and took an hallucinogenic drug. In sum, the defendant has waived this issue by failing to object and to include it specifically in his post-trial motion, and no plain error is evident.

### C. JUDGE'S QUESTIONING OF THE WITNESS

■ The defendant contends the following colloquy reflects error on the part of the trial judge which deprived him of a fair trial:

"Q. [Defense counsel] You could move them [your hands] away from your body?

A. [Victim] Yes.

Q. Which way?

A. I could move them up and down a little bit, and I could move them a little back and forth (Indicating).

Q. Could you stand up and make those motions so we can see better.

A. (Indicating) I would move them up and down a little bit.

Q. You say a little bit, you are indicating that you are bringing your arms up the way up past your chest, is that how you could move them?

A. About this high (Indicating).

Q. So as you are laying there, you could bring your arms up about 130 degrees?

A. Yes.

THE COURT: Do you know what 130 degrees is?

A. No.

THE COURT: Then don't say yes if you don't know.

Q. If you went from straight out to perpendicular that's 90 degrees.

A. Okay.

THE COURT: Pardon me. Do you know what perpendicular means?

A. Up and down?

THE COURT: Does that mean up and down?

A. It means 90 degree angle.

THE COURT: If you understand the question, answer the question, if you don't understand it, tell the lawyer you don't understand it.

Q. Miss [victim], perpendicular, 90 degrees is a box, rectangular, assume that is true, that the corner of a rectangle makes a 90 degree turn. So if you flex your arm from straight out on your side upward towards your shoulder, you have indicated, it appears you indicated, you are past 90 degrees, it's some place beyond that, may [*sic*] a hundred degrees or a hundred and ten, is that correct?

THE COURT: Do you know what that means, a rectangle?

THE WITNESS: It means you move your arm. I couldn't reach to pull anything off my face.

Mr. Canfield: But, you could bring it up, is that right?

A. Somewhat, yes."

The defendant asserts the judge's comments and questioning of the victim when she was on the witness stand amounted to an invasion of the province of the jury; an exhibition of bias in favor of the witness; an extensive examination which usurped the function of counsel and gave undue prominence to the matter at issue and an improper rehabilitation of the witness. He claims that from the colloquy "it appears the court was attempting to protect the witness from giving testimony which was contrary to that contained in the transcript of the preliminary hearing, and thus was impeaching." As the State points out, there is no indication that the jury had any knowledge of what had occurred at the preliminary hearing or how it would know that anything the witness would say was inconsistent with anything prior to her testimony at trial.

The State argues the error was waived due to the lack of timely objection at trial or the inclusion of the issue in the defendant's posttrial motion. It points out the same issue was raised, and rejected, under the waiver rule, in *People v. Christmas* (1977), 54 Ill. App. 3d 612.

The defendant has waived this issue and no plain error is evident. The colloquy on its face fails to support the defendant's characterization of the judge's actions. At first blush, the judge's comments re-

flect chastisement of the witness—not protectiveness toward her—for having answered a question affirmatively which she apparently did not understand. When the question, answer, and physical demonstration of the degree of movement did not jibe, the judge was well within his discretion—and properly executing his duty—to clarify the discrepancy. *People v. Gaston* (1967), 85 Ill. App. 2d 403; *People v. Hodges* (1974), 20 Ill. App. 3d 1016.

ISSUE III. IMPEACHMENT WITH PRIOR ATTEMPTED RAPE CONVICTION

■■ Lastly, the defendant asserts the court abused its discretion in allowing his impeachment with a 1975 attempted rape conviction, claiming the probative value of its use was minimal, but the prejudice to him was overwhelming. He argues attempted rape is a crime which does not bear directly on a person's honesty or veracity, and the similarity of the prior and present crimes particularly enhanced the prejudice inherent in such impeachment. He asserts the case hinged on the credibility of the victim vis-a-vis himself, and the improper impeachment prejudiced the outcome of the case.

The State counters that the impeachment of the defendant's credibility in this manner was technically permissible as a matter of law as expressed in the controlling case, *People v. Montgomery* (1971), 47 Ill. 2d 510. Additionally, the State asserts the court did not abuse its discretion by allowing the impeachment. The State points out the probative value of the impeachment evidence was substantial, in that the jury is entitled to have accurate tools with which to assess the relative veracity of the primary witnesses. Further, the prosecutor did not dwell on the evidence of the prior conviction—he merely announced the fact of it and the year in which it occurred—and the court promptly admonished the jury about the limited purpose of that evidence. Further, the appropriate Illinois Pattern Jury Instruction, Criminal, No. 3.13 (2d ed. 1981), was also given to the jury.

Briefly stated, the pertinent part of the *Montgomery* rule allows the impeachment of a defendant's credibility with evidence of a prior conviction if the crime was punishable by death or imprisonment of more than one year and the accused was convicted of such crime within the last 10 years, unless the judge determines that the probative value of evidence of the crime is substantially outweighed by the danger of unfair prejudice. (*People v. Guyon* (1983), 117 Ill. App. 3d 522, 540-41.) Where it appears in the record that the court is clearly aware of *Montgomery,* " 'it must be assumed that the judge gave appropriate consideration to the relevant factors and they need not appear of record. [Citation.]' " *People v. Guyon* (1983), 117 Ill. App. 3d

522, 541.

There is no question that the court here was aware of *Montgomery* when the issue was presented by defendant's motion *in limine*, and the court fully complied with its directives in exercising its discretion. Although the prior conviction need not be one involving veracity or honesty if it otherwise falls within the *Montgomery* rule, the crime of rape has been characterized as a veracity-related crime which is probative of a witness' credibility. (*People v. Medreno* (1981), 99 Ill. App. 3d 449; accord, *People v. Hall* (1983), 117 Ill. App. 3d 788, 799.) As stated in *Medreno*, "[A] serious felony conviction evinces a disrespect for societal order and thus adversely affects [the defendant's] veracity." *People v. Medreno* (1981), 99 Ill. App. 3d 449, 452.

Here, particularly, the probative value of the evidence outweighed its potential unfair prejudicial effect. Although this court has only the cold record of the defendant's testimony to review, numerous extraneous comments made by the defendant during his testimony evidence an attempt on his part—over and above the fact he was sworn on oath to tell the truth—to impress upon the jury that he was an honest, principled person. For example, when questioned about his "infrequent" sexual contact with the victim during the time he allegedly knew her prior to the date of the offenses at bar, he answered:

> "I'm a married man. [M]y relationship [with the victim] was solely sexual ***. It was not romantic involvement."

Later,

> "[PROSECUTOR DOYLE]: Then you say that you took [the victim] to bars, is that correct?
>
> A. Not took her to bars, no, sir, not [the victim]. [The victim] and I—I'm a married man, Mr. Doyle."

Earlier, in response to whether he had ever been out socially with the victim, he testified:

> "A. Not really socially. I have gone—I have gone out after work, and we have had a drink. But never social contact, I mean, as a wife. And I tried to be discreet.
>
> And in that particular relationship, I was trying desperately to be discreet, you know. And contact was basically at her [the victim's] apartment. I never—although there were a couple instances that I had gone out, you know, as I said before, briefly for a drink or something. But it normally was simply to meet and return to some secluded place, her apartment. And a couple of instances, a motel."

On several occasions, the defendant apologized for having to testify about the victim's alleged preference for sexual bondage

"scenes," saying he did not want to make her sound like anything less than "a genuine human being." In describing his first encounter with the victim, he testified:

> "A. It was very bizarre. Bizarre in the sense that it was something that I wasn't accustomed to as a sexual experience. [The victim] had - - after I met her, she had asked me, you know, how sexually active was I, and what was my attitude about sex, and was I aware of different or heightened dimensions of sex and sexuality.
>
> And you know, I thought that I was a sexual sophisticate, quite honestly. And she introduced some concepts to me that I found even beyond my sophistication."

■ In light of the record, the evidence of his prior attempted rape conviction had substantial probative value as to his credibility. The defendant's testimony on its face may have conveyed to the jury an image of the defendant as a discreet, thoughtful husband, a sexual sophisticate, innocently unaware even of some of the concepts of nontraditional sexual activities which were actually engaged in by the victim who, nevertheless, was "a genuine human being" who paid him for his "services" rendered during her sexual bondage fantasies. Case law is clear that a prior conviction for a crime which is similar to the present crime does not mean it cannot be introduced. (*People v. Fleming* (1980), 91 Ill. App. 3d 99, 109.) Similarity is simply a factor which the court considers when balancing the probative value against the prejudicial impact. *People v. Hall* (1983), 117 Ill. App. 3d 788, 799-800.

The court's discretion was wisely exercised and no reversal is warranted.

The judgment of the circuit court of Winnebago County is affirmed.

LINDBERG and NASH, JJ., concur.